IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GLOBAL FITNESS HOLDINGS, LLC,<br><br>Plaintiff,<br>v.<br><br>FEDERAL RECOVERY ACCEPTANCE, INC. and FEDERAL RECOVERY SERVICES, INC.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [120] DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM**<br><br>Case No. 2:13-cv-00204-DN<br><br>District Judge David Nuffer |

This case is a dispute between a former owner of physical fitness clubs and one of its billing services providers regarding the parties' obligations to each other at the termination of their contractual relationship. Plaintiff Global Fitness Holdings, LLC ("Global") filed this suit in October 2012 against two related entities (collectively "Paramount"), Federal Recovery Acceptance, Inc. ("FRAI") and Federal Recovery Services, Inc. ("FRSI"). Paramount provided the billing services for Global's large membership base. Global brought claims for tortious interference,[1] promissory estoppel,[2] conversion,[3] breach of contract,[4] and breach of the covenant of good faith and fair dealing.[5] All the claims arise out of the alleged refusal of Paramount to cooperate with Global when Global was acquired by Fitness & Sports Clubs, LLC ("L.A.

---

[1] Global Fitness Holding, LLC's Amended Complaint ("Amended Complaint") ¶¶ 38–45, docket no. 71, filed March 19, 2014.

[2] *Id.* ¶¶ 46–52.

[3] *Id.* ¶¶ 53–60.

[4] *Id.* ¶¶ 61–66.

[5] *Id.* ¶¶ 67–73.

Fitness"),[6] a non-party to this litigation. The tortious interference claim at the focus of this order is based on alleged interference with this acquisition.

In the Global–L.A. Fitness Asset Purchase Agreement ("APA"), Global was to transfer customer data to L.A. Fitness, but Global claims Federal Recovery wrongfully withheld the data pending Global's payment of termination fees to Federal Recovery.[7] Global also alleges Federal Recovery withheld over $500,000 in funds owed to Global.[8] Federal Recovery denies wrongdoing in withholding the data and funds, and has now filed several motions for summary judgment on all of Global's claims,[9] including the breach of contract claim related to data transfer that Global voluntarily dismissed.[10]

After discovery concluded in this case, Paramount filed several motions for summary judgment. This order GRANTS Paramount's motion[11] on the merits of Global's tortious interference claim.[12]

---

[6] *See generally id.*

[7] Amended Complaint ¶¶ 64–65.

[8] *Id.*  ¶¶ 61–63, 65–66.

[9] Defendants' Motion for Partial Summary Judgment on Global's Promissory Estoppel Claim, docket no. 106, filed Aug. 4, 2014; Defendants' Motion for Partial Summary Judgment RE Plaintiff's Conversion Claim and Supporting Memorandum, docket no. 108, filed Aug. 4, 2014; Defendants' Motion for Partial Summary Judgment RE: Global's Breach of Contract and Breach of the Implied Covenant Claims and Memorandum in Support Thereof ("Breach Motion"), docket no. 111, filed Aug. 4, 2014; Defendants' Motion for Partial Summary Judgment on Global's Tortious Interference Claim, docket no. 120, filed under seal Aug. 4, 2014;  and Defendants' Motion for Partial Summary Judgment RE: Global's Tortious Interference Claim for Lack of Causation and Memorandum in Support Thereof, docket no. 121, filed under seal Aug. 4, 2014.

[10] Global Fitness, LLC's Motion for Voluntary Dismissal of its Breach of Contract Claim Against Federal Recovery Acceptance, Inc. as it Relates to the Transfer of Data, docket no. 132, filed Sept. 4, 2014 ("Motion for Voluntary Dismissal").

[11] Defendants' Motion for Partial Summary Judgment on Global's Tortious Interference Claim ("Paramount's Motion on Tortious Interference"), docket no. 120, filed under seal Aug. 4, 2014, redacted version in docket no. 123, filed Aug. 7, 2014.

[12] Another motion directed at the same tortious interference claim is also decided today.

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................ 3
STATEMENT OF UNDISPUTED MATERIAL FACTS .......................................... 6
    I.      Tortious Interference with a Contract, Element 4: The Defendant's Actions Did Indeed Cause a Breach ........................................................................... 6
    II.     Tortious Interference with a Contract Element 4: The Defendant's Actions Did Indeed Cause a Breach by a Third Party ................................................ 8
    III.    Tortious Interference with a Contract, Element 6: Defendant Had No Privilege or Justification to Excuse Its Conduct; Tortious Interference With A Prospective Business Advantage, Element 4: The Motive Behind the Interference Was Improper ............................................................................................................ 9
SUMMARY JUDGMENT STANDARD ................................................................. 11
APPLICABLE LAW .................................................................................................. 12
ANALYSIS .................................................................................................................. 13
    I.      Global Cannot Succeed On A Claim For Tortious Interference With A Contract. .................................................................................................... 13
         A.    There Was No Breach of the APA. ................................................ 16
         B.    Kentucky Does Not Recognize a Claim For Reverse Tortious Interference with a Contract, Where the Litigants Are Parties to the Allegedly Interfered Contract. .............................................................. 18
         C.    Paramount Was Justified In Its Actions. ...................................... 20
    II.     Global Cannot Succeed on A Claim for Interference with A Prospective Business Advantage. ........................................................................................... 25
         A.    Global Had A Contractual Relation with L.A. Fitness. ............... 25
         B.    Any Alleged Interference by Paramount Did Not Prevent the Business Relation from Coming to Fruition Because the Evidence Clearly Shows that L.A. Fitness Enter into a Business Relation with Global. ................ 27
         C.    Kentucky Would Not Recognize A Claim for Reverse Tortious Interference with a Prospective Business Relation. .................................. 29
         D.    Paramount's Refusal to Transfer the Member Account Data Was Not Improper Because Paramount Was Justified in Exercising and Protecting its Rights Under the Contracts. ................................................................. 32
    III.    Global's Claim for Punitive Damages Premised on Tortious Interference Must Necessarily Fail. .......................................................................................... 32
ORDER ........................................................................................................................ 33

# BACKGROUND

At all relevant times prior to October 2012, Global owned and operated multiple fitness centers in multiple states.[13] Beginning in 2008, Global began contracting with FRAI for FRAI to process billing and collections for customers of certain Global facilities (the data processed by

---

[13] Amended Complaint ¶ 7.

FRAI is "Member Account Data").[14] The Member Account Data included not only information about the customers' purchases and preferences, but also their personal credit card ("CC") and bank account transfer ("ACH") information (collectively the "Billing Information") used to charge those customers for using Global's fitness centers.[15]

In 2008, Global and FRAI executed eight location-specific contracts (the "2008 Contracts");[16] in 2009, Global and FRAI executed two additional contracts: one amending the 2008 Contracts (the "Existing Locations Agreement") and another to govern all remaining locations (the "New Location Agreement");[17] and in 2011, Global and FRAI executed two more location-specific contracts (the "2011 Contracts")[18] (the 12 contracts collectively are the "Contracts" or the "Paramount Contracts"). FRAI contracted with FRSI to perform the services necessary for FRAI to fulfill its obligations under the Contracts.[19]

On or around September 10, 2012, Global publicly announced that it had entered into and Asset Purchase Agreement (the "APA") with L.A. Fitness, whereby L.A. Fitness would purchase substantially all of the assets of Global.[20] The formula for calculating the purchase price varied if

---

[14] Defendants' Amended Answer to Plaintiff's Amended Complaint and Counterclaim ("Counterclaim") ¶ 19, docket no. 85, filed April 22, 2014.

[15] Amended Complaint ¶ 9.

[16] Counterclaim ¶ 19; *see also* Contracts (dated 2008), Contracts collectively attached as Exhibit F to Paramount's Motion on Tortious Interference, docket no. 120-7, filed Aug. 4, 2014; the 2008 contracts are also collectively attached as Exhibit F to Unsealed Exhibits to Global Fitness Holding, LLC's Memorandum in Opposition to Federal Recovery Services Inc.'s Motion for Partial Summary Judgment RE: Global's Tortious Interference Claim ("Global's Exhibits on Tortious Interference"), docket no. 154-6, filed Sep. 5, 2014.

[17] Amended Complaint ¶ 13; Counterclaim ¶ 23; *see also* Contracts (dated 2009); the 2009 contract referred to as the "Existing Locations Agreement" is also attached as Exhibit H to Global's Exhibits on Tortious Interference, docket no. 154-8, filed Sep. 5, 2014; the 2009 contract referred to as the "New Locations Agreement" is also attached as Exhibit I to Global's Exhibits on Tortious Interference, docket no. 154-9, filed Sep. 5, 2014.

[18] Counterclaim ¶ 24; *see also* Contracts (dated 2011).

[19] Amended Complaint ¶¶ 14–16.

[20] *Id.* ¶ 8.

the APA closed after October 15, 2012.[21] On September 11, 2012, Global sent Paramount an email providing the 45-day termination notice required under Global's Contracts with Paramount.[22] On October 3, 2012, Global requested that Paramount transfer the Member Account Data, including the Billing Information, no later than October 5, 2012.[23] Paramount transferred the Member Account Data, including the Billing Information, to Global on October 11, 2012.[24]

In its tortious interference claim, Global contends that Paramount tortiously interfered with the APA by failing to transfer the Billing Information on October 5, 2012, thereby causing harm to Global.[25] Paramount filed its Motion on Tortious Interference on August 4, 2014, Global filed an opposition memorandum[26] on September 4, 2014, and Paramount filed a reply memorandum[27] on September 22, 2014. Oral argument on Paramount's Motion on Tortious Interference was held on May 11, 2015.[28]

---

[21] *See* APA at Section 1 under definition of "Gross Purchase Price, relevant portions attached as Exhibit A to Paramount's Motion on Tortious Interference, docket no. 120-2, filed Aug. 4, 2014; also attached as Exhibit W to Global's Exhibits on Tortious Interference, docket no. 150-2, filed Sep. 5, 2014.

[22] Amended Complaint ¶ 23; Sept. 11, 2012 E-mail from K. Trawick to S. Nelson, et al. ("Sept. 11, 2012 Trawick Email"), attached as Exhibit H to Paramount's Motion on Tortious Interference, docket no. 120-9, filed Aug. 4, 2014, also attached as Exhibit O to Global's Exhibits on Tortious Interference, docket no. 154-15, filed Sep. 5, 2014.

[23] *Id.* ¶ 28; October 3, 2012 E-mail from Keith Trawick to Sid Nelson, attached as Exhibit Q to Global's Exhibits on Tortious Interference, docket no. 154-17, filed Sep. 5, 2014.

[24] *See* Deposition of Keith Trawick dated March 18, 2014 ("Trawick Depo.") at 262:19–23, attached as Exhibit J to Paramount's Motion on Tortious Interference, docket no. 120-11, filed Aug. 4, 2014; other portions also attached as Exhibit D to redacted version of Paramount's Reply on Tortious Interference, docket no. 174-5, filed Sep. 23, 2014.

[25] Amended Complaint ¶¶ 38–45.

[26] Global Fitness Holdings, LLC's Memorandum in Opposition to Federal Recovery Acceptance, Inc. and Federal Recovery Services Inc.'s Motion for Partial Summary Judgment on Global's Tortious Interference Claim ("Global's Opposition on Tortious Interference"), docket no. 150, filed under seal Sep. 5, 2014; redacted version, docket no. 157, filed Sep. 15, 2014.

[27] Reply Memorandum in Support of Defendants' Motion for Partial Summary Judgment on Global's Tortious Interference Claim & Exhibit Index with Exhibit A Filed Under Seal ("Paramount's Reply on Tortious Interference"), docket no. 170, filed under seal on Sep. 22, 2014; redacted version, docket no. 174, filed Sep. 23, 2014.

[28] *See* Docket no. 251, filed May 11, 2015 (Minute entry) and Transcript 5/11/15, docket no. 254, filed May 20, 2015.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The below collection of undisputed material facts is distilled from the above listed filings. Paramount's Motion on Tortious Interference provided a statement of facts[29] and supporting exhibits. Global's Opposition on Tortious Interference responded to Paramount's statement of facts[30] and provided a statement of additional facts[31] and its own set of exhibits.[32] Paramount's Reply on Tortious Interference replied to Global's responses to Paramount's statement of facts[33] and responded to Global's additional facts.[34]

An email was sent to counsel with a summary set of undisputed facts on May 8, 2015.[35] That summary was reviewed at the start of the hearing on May 11, 2015.[36] The below collection of undisputed facts was finalized following the May 11, 2015 hearing based on discussion at the hearing.[37] The headings in the statement of facts are descriptive, not declaratory or substantive, and they are taken from the elements as described in the parties' motions.

### I.   Tortious Interference with a Contract, Element 4: The Defendant's Actions Did Indeed Cause a Breach

1.   On September 5, 2012, Global and L.A. Fitness executed a certain Asset Purchase Agreement ("APA").[38]

---

[29] Paramount's Motion on Tortious Interference at 3–9.

[30] Global's Opposition on Tortious Interference at 8–11.

[31] *Id.* at 12–14.

[32] Global's Exhibits on Tortious Interference.

[33] Paramount's Reply on Tortious Interference at iii–ix.

[34] *Id.* at ix–xix.

[35] E-mail from Judge Nuffer's Chambers to counsel (May 8, 2015), lodged as docket no. 273 on Aug. 31, 2015.

[36] Transcript 5/11/15 16:8–32:1, docket no. 254, filed May 20, 2015.

[37] *Id.*

[38] *See* APA at 1. *See also* Deposition of Coby DeVary ("DeVary Depo.") at 129:4–5, relevant portions attached as Exhibit B to Paramount's Motion on Tortious Interference, docket no. 120-3, filed Aug. 4, 2014.

2.      In the APA Global and L.A. Fitness agreed to an "Outside Date" of October 31, 2012 for closing the transaction contemplated by the APA. However, they did not agree to any specific "Closing Date" in the APA or at any time in writing prior to October 16, 2012.[39]

3.      Specifically, the APA provided that it may be terminated:

by written notice by Global to Buyer or by Buyer to Global, as the case may be, in the event the Closing has not occurred prior to October 31, 2012 (the "Outside Date") for any reason other than delay or nonperformance of or breach by the party to this Agreement seeking termination.[40]

4.      The APA stated that the formula for calculating the purchase price may change depending on whether closing of the transaction occurred before or after October 16, 2012.[41]

5.      Specifically, "Gross Purchase Price" under the APA is defined as:

"Gross Purchase Price" means: (a) if the Closing occurs prior to October 16, 201 and August 2012 TTM Adjusted EBITDA is equal to or greater than the product of (i) ninety percent (90%) multiplied by (ii) July 2012 TTM Adjusted EBITDA, then "Gross Purchase Price" shall mean an amount equal to the July 2012 Gross Purchase Price; (b) if the Closing occurs prior to October 16, 2012 and August 2012 TTM Adjusted EBITDA is less than the product of (i) ninety percent (90%) multiplied by (ii) July 2012 TTM Adjusted EBITDA, then "Gross Purchase Price" shall mean an amount equal to the August 2012 Gross Purchase Price, or (c) if the Closing has not occurred prior to October 16, 2012, then "Gross Purchase Price" shall mean an amount equal to the lesser of (i) the September 2012 Gross Purchase Price, (ii) the August 2012 Gross Purchase Price or (iii) the July 2012 Gross Purchase Price.[42]

---

[39] *See* APA at Section 10.1; *see also* Deposition of Royce Pulliam dated March 21, 2014 ("Pulliam Depo.") at 94:25–96:7, relevant portions attached as Exhibit C to Paramount's Motion on Tortious Interference, docket no. 120-4, filed Aug. 4, 2014; DeVary Depo. at 71:13–72:7, 184:15–17, 283:10–285:3; *see also* September 3, 2012 email from Coby DeVary to Kathy Polson, attached as Exhibit D to Paramount's Motion on Tortious Interference, docket no. 120-5, filed Aug. 4, 2014 ("The outside closing date would be 10/31/2012").

[40] *See* APA at Section 10.1(e).

[41] *See id.* at Section 1 under definition of "Gross Purchase Price;" *see also* DeVary Depo. at 267:12–268:24.

[42] *See id.*

6.      While the formula for calculating the purchase price had the potential to change depending on whether the APA closed before October 16, 2012, the outside closing date for Global and L.A. Fitness was October 31, 2012.[43]

7.      Global and L.A. Fitness testified that the closing of the APA took place on October 25, 2012, six days before the outside closing date,[44] while a Bill of Sale between Global and L.A. Fitness is dated October 26, 2012.[45]

8.      L.A. Fitness and Global both testified that neither L.A. Fitness nor Global breached the contract by closing on October 25, 2012.[46]

## II.      Tortious Interference with a Contract Element 4: The Defendant's Actions Did Indeed Cause a Breach by a Third Party

9.      On September 5, 2012, Global and L.A. Fitness executed a certain Asset Purchase Agreement ("APA").[47]

---

[43] *See* APA at Section 10.1 (defining the Outside Closing Date as October 31, 2012); *see also* Section 1 under definition of "Gross Purchase Price" (providing for potentially using different purchase price formulas depending on whether closing occurred before or after October 16, 2012); *see also* DeVary Depo. at 71:13–72:7 (acknowledging that the "deal can still go through and would be approved based on the terms of the asset purchase agreement if the closing date had occurred by October 31, 2012"), 267:12–268:24 (discussing that a different purchase price formula may be used depending on whether closing occurred before or after October 16, 2012); Pulliam Depo. at 94:25–96:7 (stating that October 31, 2012 was the date by which the parties could back out of the deal if closing had not occurred).

[44] *See* DeVary Depo. at 98:9–11 ("Q: Do you know the date that Global and L.A. Fitness actually closed? A: October 25th"); *see also* 30(b)(6) Deposition of L.A. Fitness dated April 22, 2014, Kathryn Polson deponent ("Polson Depo.") at 90:9–18, relevant portions attached as Exhibit E to Paramount's Motion on Tortious Interference, docket no. 120-6, filed Aug. 4, 2014; relevant portions also attached as Exhibit E to Paramount's Reply on Tortious Interference, docket no. 174-6, filed Sep. 23, 2014 (stating that as of October 26, 2012 L.A. Fitness was operating Global's clubs), other portions also attached as Exhibit X to Global's Exhibits on Tortious Interference, docket no. 154-22, filed Sep. 5, 2014.

[45] *See* Bill of Sale ("Global Bill of Sale"), attached as Exhibit V to Global's Opposition on Tortious Interference, docket no. 150-1, filed Sep. 5, 2014.

[46] *See* Polson Depo. at 115:20–116:20 (stating that she was not aware of either Global or L.A. Fitness ever breaching the APA and that she would have known if either party claimed the other had breached the APA); *see also* DeVary Depo. at 284:15–24 (stating that a closing date as late as October 31, 2012 would be a violation of the APA).

[47] *See* APA at 1; *see also* DeVary Depo. at 129:4–5.

10.     In its Amended Complaint, Global alleges that "[a]s a direct and proximate cause of the acts and omissions of Paramount and/or FRSI, Global Fitness was unable to perform its obligations under the APA."[48]

### III.   Tortious Interference with a Contract, Element 6: Defendant Had No Privilege or Justification to Excuse Its Conduct; Tortious Interference With A Prospective Business Advantage, Element 4: The Motive Behind the Interference Was Improper.

11.     Each of the Contracts between Global and FRAI contains the following termination provision: "Contractor or Company may terminate this Agreement at any time for any reason upon 45 day prior written notice."[49]

12.     On September 11, 2012, Keith Trawick, on behalf of Global, emailed Paramount stating:

> Pursuant to the terms of our agreement with you, dated September 11, 2009, 45 day notice is hereby given for the termination of the Agreement. As we discussed, the clubs have been sold to L.A. Fitness and at this time, we are unsure of the exact closing date.[50]

13.     Six days earlier, on September 5, 2012, Global and L.A. Fitness executed a certain Asset Purchase Agreement ("APA").[51]

14.     The APA was a written contract between L.A. Fitness and Global Fitness regarding what steps were necessary to finalize this transaction regarding the sale and transfer of certain assets.[52]

---

[48] Amended Complaint ¶ 41.

[49] *See* Contracts at section entitled "Term"; *see also* DeVary Depo. at 12:24–13:24.

[50] *See* Sept. 11, 2012 Trawick Email.

[51] *See* APA at 1; *see also* DeVary Depo. at 129:4–5.

[52] *See* APA at § 5.4 ("With respect to each Seller, this Agreement and each of the Collateral Agreements to which such Seller is a party constitute legal, valid, and binding agreements of such Seller, enforceable against such Seller in accordance with their respective terms"), at § 13.15 (expressly providing the parties with the right to seek injunctive relief and specific performance if the other party fails to perform its obligations under the APA), at Recitals ¶ C ("Sellers have agreed to sell to Buyer the Assets"), at § 4.1 ("stating that the closing "shall take place no later than on the fifth (5th) Business Day following the day on which the last to be satisfied or waived of the

15.    Once the APA was in place, the parties agreed to multiple potential dates to close on that transaction, one of which was October 15, 2012.[53] This agreement to close on October 15 was not a part of the APA.

16.    Paramount transferred the complete set of member account data to Global on October 11, 2012.[54]

17.    Before October 3, 2012, Paramount provided Global with all requested Member Account Data including weekly productions during the final months of the contracts and productions after Global provided notice to terminate the Contracts; CC and ACH information was not included.[55]

18.    When Global made a demand on October 3, 2012 for the return of its Member Account Data, including the billing information, internal correspondence from Paramount, spanning from October 3, 2012 to October 11, 2012, establishes that they were concerned that if they provided the requested data they would be unable to collect their termination fees.[56]

19.    Specifically Defendants stated in e-mail correspondence:

    a.    "If we give them a full cut we'll never get any money from them . . . ."[57]

    b.    "Please check and recheck all files we are sending to [Global Fitness] to make sure we DO NOT include the banking information!"[58]

---

conditions set forth in Sections 8 and 9"), at §10.1(b) (stating that the APA may be terminated "if there has been a breach of any representation, warranty, covenant or agreement by any Seller"), at § 10.1(e) (stating that the APA may be terminated by either party if closing has not occurred by October 31, 2012 "for any reason other than delay or nonperformance of or breach by the party to this Agreement seeking such termination").

[53] Polson Depo at 131:16–19.

[54] *See id.* at 189:9–190:14 (acknowledging that Paramount transferred the Member Account Data on October 11, 2012); Trawick Depo. at 262:19–23.

[55] *See* Amended Complaint ¶¶ 26–28; Counterclaim ¶¶ 46–47, at 25–26.

[56] *See infra nn.*29–32.

[57] Oct. 3, 2012 E-mail chain from Glen Bendixen to Sid Nelson et al., attached as Exhibit BB to Global's Exhibits on Tortious Interference, docket no. 154-26, filed Sep. 5, 2014.

      c.      "Prior to shutting of [Defendants] system, the required payments to [Defendants] and reserves for contingencies must be agreed upon and paid."[59]

      d.      "I think [Global Fitness and L.A. Fitness] are trying to sign tomorrow or Friday leaving us no ability to build up a reserve. The billing info is the only card we have left."[60]

20.      On the morning of October 11, 2012, Kathy Polson of L.A. Fitness informed Coby DeVary of Global Fitness that because Global did not have the Paramount data, Global would not be in a position to close on October 15.[61] Ms. Polson testified that the APA did not close on October 15, 2012 because L.A. Fitness did not have all of the items it needed for closing, including, in addition to the Paramount Member Account Data, lease assignments, schedules, payoff letters, SNDAs, and documentation regarding subtenants.[62] Ms. Polson specifically testified that even if L.A. Fitness had the Paramount data, closing still would not have occurred on October 15, 2012 because of all of the other items Global had failed to provide.[63]

**SUMMARY JUDGMENT STANDARD**

      Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[64] "An issue of

---

[58] Oct. 5, 2012 E-mail chain from Todd Rasmussen to Glen Bendixen, attached as Exhibit CC to Global's Exhibits on Tortious Interference, docket no. 154-27, filed Sep. 5, 2014.

[59] Oct. 9, 2012 E-mail from Thomas Klc, attached as Exhibit T to Global's Exhibits on Tortious Interference, docket no. 154-20, filed Sep. 5, 2014.

[60] Oct. 3, 2012 E-mail from Todd Rasmussen to Glen Bendixen, attached as Exhibit R to Global's Exhibits on Tortious Interference, docket no. 154-18, filed Sep. 5, 2014.

[61] Polson Depo. at 249:8–12; DeVary Depo. at 98:5–8.

[62] *See* Polson Depo. at 132:14–136:9.

[63] *See id.* at 135:24–136:9.

[64] Fed. R. Civ. P. 56(a).

material fact is 'genuine' if a reasonable jury could return a verdict for the nonmoving party."[65]
In moving for summary judgment, Paramount "bears the burden of showing the absence of a
genuine issue of material fact . . . ."[66] However, Paramount "need not negate [Global's] claim[s],
but need only point out to the district court 'that there is an absence of evidence to support
[Global's] case.'"[67] Upon such a showing, Global "must set forth *specific facts* showing that
there is a *genuine issue* for trial as to those dispositive matters for which [Global] carries the
burden of proof."[68] "The mere existence of a scintilla of evidence in support of the plaintiff's
position will be insufficient to defeat a properly supported motion for summary judgment."[69]

## APPLICABLE LAW

Global originally filed this case in the United States District Court for the Eastern District
of Kentucky.[70] Federal jurisdiction in this case is premised on diversity.[71] Venue was
subsequently transferred to the District of Utah.[72] The parties have stipulated and agreed that
Kentucky law applies to Global's claim for tortious interference.[73]

---

[65] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).

[66] *Universal*, 22 F.3d at 1529.

[67] *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[68] *Id.* (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (internal quotation marks omitted)) (both emphases in original).

[69] *Id.* (quoting *Anderson*, 477 U.S. at 252).

[70] Complaint, docket no. 1, filed Oct. 10, 2012.

[71] *See* 28 U.S.C. § 1332(a); *see also* Complaint ¶ 3 ("This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as it involves citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."); *see also* Amended Complaint ¶ 4.

[72] Memorandum Opinion & Order, docket no. 34, filed Mar. 20, 2013.

[73] *See, e.g.*, Paramount's Motion on Tortious Interference at 4, 10; *see also* Global's Opposition on Tortious Interference at 8, 15.

## ANALYSIS

In its Amended Complaint, Global alleges that Paramount tortiously interfered with Global's ability to perform its obligations under the APA, harming Global.[74] Global further alleges that Paramount's interference with the APA was intentional, willful, and reckless, entitling Paramount to punitive damages.[75]

Kentucky law recognizes two separate claims for tortious interference: tortious interference with a contract; and tortious interference with a prospective business advantage.[76] For the reasons discussed below, Global cannot succeed on either claim. Accordingly, Paramount's Motion on Tortious Interference is GRANTED and Global's tortious interference claim is dismissed.

### I.   Global Cannot Succeed On A Claim For Tortious Interference With A Contract.

To establish tortious interference with a contract, a plaintiff must prove six elements: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) that defendant intended to cause a breach of that contract; (4) that the defendant's actions did indeed cause a breach by a third party; (5) that damages resulted to Plaintiff; and (6) that defendant had no privilege or justification to excuse its conduct.[77]

In Global's Opposition on Tortious Interference, Global states that it is not pursing a claim for interference with a contract but only a claim for interference with a prospective business advantage.[78]  Further, at the May 11, 2015 hearing on Paramount's Motion, counsel for

---

[74] Amended Complaint ¶¶ 41–44.

[75] *Id.* ¶ 45.

[76] *See e.g. Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5–6 (Ky. Ct. App. 2012); *Monumental Life Ins. Co. v. Nationwide Ret. Solutions, Inc.*, 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003).

[77] *Snow Pallet*, 367 S.W.3d at 5–6.

[78] *See* Global's Opposition on Tortious Interference at 8.

Global further stated that Global was not pursuing a claim for interference with a contract.[79]
However, although Global disagrees with the label, its Amended Complaint only pleads a claim
for tortious interference with a contract.

In its Amended Complaint, Global alleges that Paramount was aware of the "continuing
and ongoing relationship with L.A. Fitness through the terms of the APA.[80] Global further
alleges that Paramount's actions made Global "unable to perform its obligations under the
APA"[81] and that Paramount's actions "interfered and threatened Global Fitness's business
relationship with L.A. Fitness."[82] These allegations clearly focus on alleged interference with the
APA. To the extent Global would characterize Paramount's alleged interference as interference
with Global's relationship with L.A. Fitness, Global is wrong. Global's relationship with L.A.
Fitness is governed by the APA. The only question then is whether the APA is a contract.

Global argues that the APA was not a contract; rather, it was only an "understanding on
what necessary steps were required to finalize this transfer."[83] However, by its very terms, it is
clear the APA is a contract.[84] For example, the APA includes a termination provision that states
that the APA may be terminated:

---

[79] *See* Transcript 5/11/15 65:10–18, docket no. 254, filed May 20, 2015 (MR. OWEN: Again, we don't have a
contract claim as it relates to this. The COURT: You don't have a tortious interference with contract claim? MR.
OWEN: Right. It's prospective contract. THE COURT: And what is the prospective contract that is to be made?
MR. OWEN: It is to close and have the bill of sale to transfer these -- these gyms by the October 15th date."); see
also *id.* at 71:2–4 ("THE COURT: Okay. So you're disclaiming entirely an interference with contract claim? MR.
OWEN: Yes, Your Honor.").

[80] Amended Complaint ¶ 40.

[81] *Id.* ¶ 41.

[82] *Id.* ¶ 42.

[83] Global's Opposition on Tortious Interference at 16.

[84] *See* APA § 5.4 ("With respect to each Seller, this Agreement and each of the Collateral Agreements to which such
Seller is a party constitute legal, valid, and binding agreements of such Seller, enforceable against such Seller in
accordance with their respective terms"); § 13.15 (expressly providing the parties with the right to seek injunctive
relief and specific performance if the other party fails to perform its obligations under the APA); Recitals ¶ C
("Sellers have agreed to sell to Buyer the Assets"); § 4.1 ("stating that the closing "shall take place no later than on
the fifth (5th) Business Day following the day on which the last to be satisfied or waived of the conditions set forth in

> by written notice by Global to Buyer or by Buyer to Global, as the case may be, in the event the Closing has not occurred prior to October 31, 2012 (the "Outside Date") for any reason other than delay or nonperformance of or breach by the party to this Agreement seeking termination.[85]

This provision plainly refers to the APA as an "Agreement," discusses *closing* of the APA, and mentions issues of *performance* and *breach* of the APA. If the APA was merely an understanding of necessary steps, it would neither need to be closed nor terminated, nor could it have been performed or breached. Those terms are characteristics of contracts.

The APA is a mutually agreed upon contract that was executed by and imposed rights and obligations upon both parties. It is further clear that both L.A. Fitness and Global rendered performance under that contract.[86] The evidence shows that the APA closed on either October 25 or October 26, 2012.[87] The APA was not simply a hope for Global and L.A. Fitness to potentially consummate a deal in the future: it was a contract.

Despite Global's disclaimer of a claim for interference with a contract, because Global's claim pleads alleged interference with the APA, and because the APA is a contract, Global's claim is one for tortious interference with a contract and is not a claim for interference with a prospective business relationship.

Because Global has plead and disclaimed tortious interference with a contract, Paramount would be entitled to summary judgment as a matter of law. However, Global's claim for tortious interference with a contract fails, as described further below, for three additional reasons: (A)

---

Sections 8 and 9"); §10.1(b) (stating that the APA may be terminated "if there has been a breach of any representation, warranty, covenant or agreement by any Seller"); § 10.1(e) (stating that the APA may be terminated by either party if closing has not occurred by October 31, 2012 "for any reason other than delay or nonperformance of or breach by the party to this Agreement seeking such termination").

[85] *See* APA at Section 10.1(e).

[86] *See* DeVary Depo. at 98:9–11 ("Q: Do you know the date that Global and L.A. Fitness actually closed? A: October 25th"); *see also* Polson Depo. at 90:9–18 (stating that as of October 26, 2012 L.A. Fitness was operating Global's clubs).

[87] *See* id.

there was no breach of the APA; (B) Kentucky does not recognize a claim for reverse tortious interference with a contract, where the litigants are parties to the allegedly interfered contract, the claim Global attempts to make; and (C) Paramount was justified in its actions.

### A. There Was No Breach of the APA.

Even if Global hadn't disclaimed tortious interference with a contract, Global's claim fails because the APA was never breached.

Applying Kentucky law, the Sixth Circuit has recognized that "[t]wo of the necessary elements of this tort are the existence of a contract between the plaintiff and a third party and a subsequent breach of the contract by the third party."[88]  In *Industrial Equipment*, the Court found that a tortious interference claim failed because the plaintiff had not established the existence of a contract or a breach of that contract by a third party.[89] Similarly, in this case, there was no breach of the APA. As such, Global's claim fails on this element alone.

The APA was executed by Global and L.A. Fitness on September 5, 2012.[90] In the APA, Global and L.A. Fitness agreed to an "Outside Date" of October 31, 2012 for closing the transaction contemplated by the APA. As noted above, the APA provided that it could be terminated.[91]

Additionally, the APA contained a provision for changing the purchase price formula if the transaction closed after October 15, 2012.[92] Specifically, "Gross Purchase Price" under the APA is defined as:

---

[88] *Indus. Equip. Co. v. Emerson Elec. Co.*, 554 F.2d 276, 289 (6th Cir. 1977).

[89] *See id.* (stating that because the plaintiff did not establish  the existence of a contract and a breach, it "did not establish the requisite elements of the tort of interference with contractual relations, and its claim was properly dismissed.").

[90] *See* APA at 1. *See also* DeVary Depo. at 129:4–5.

[91] *See id.* at Section 10.1(e).

[92] *See id.* at Section 1 under definition of "Gross Purchase Price;" *see also* DeVary Depo. at 267:12–268:24.

"Gross Purchase Price" means: (a) if the Closing occurs prior to October 16, 201 and August 2012 TTM Adjusted EBITDA is equal to or greater than the product of (i) ninety percent (90%) multiplied by (ii) July 2012 TTM Adjusted EBITDA, then "Gross Purchase Price" shall mean an amount equal to the July 2012 Gross Purchase Price; (b) if the Closing occurs prior to October 16, 2012 and August 2012 TTM Adjusted EBITDA is less than the product of (i) ninety percent (90%) multiplied by (ii) July 2012 TTM Adjusted EBITDA, then "Gross Purchase Price" shall mean an amount equal to the August 2012 Gross Purchase Price, or (c) if the Closing has not occurred prior to October 16, 2012, then "Gross Purchase Price" shall mean an amount equal to the lesser of (i) the September 2012 Gross Purchase Price, (ii) the August 2012 Gross Purchase Price or (iii) the July 2012 Gross Purchase Price.[93]

However, while the formula for calculating the purchase price had the potential to change depending on whether the APA closed before October 16, 2012, the outside closing date for Global and L.A. Fitness was October 31, 2012.[94] In other words, even if closing after October 15, 2012 caused financial loss to one of the parties (while causing the other party financial gain), closing after October 15 would not constitute a breach of the APA. Rather, it was provided for by the APA. It is undisputed that the closing of the APA occurred, at the latest, by October 26, 2012.[95] Importantly, both L.A. Fitness and Global testified that neither L.A. Fitness nor Global breached the contract by closing by October 26, 2012.[96] Because closing occurred, there was no

---

[93] *See* APA at Section 1 under definition of "Gross Purchase Price."

[94] *See id.* at Section 10.1 (defining the Outside Closing Date as October 31, 2012); *see also* Section 1 under definition of "Gross Purchase Price" (providing for potentially using different purchase price formulas depending on whether closing occurred before or after October 16, 2012); *see also* DeVary Depo. at 71:13–72:7 (acknowledging that the "deal can still go through and would be approved based on the terms of the asset purchase agreement if the closing date had occurred by October 31, 2012"), 267:12–268:24 (discussing that a different purchase price formula may be used depending on whether closing occurred before or after October 16, 2012); Pulliam Depo. at 94:25–96:7 (stating that October 31, 2012 was the date by which the parties could back out of the deal if closing had not occurred).

[95] *See* Global Bill of Sale; DeVary Depo. at 98:9–11 ("Q: Do you know the date that Global and L.A. Fitness actually closed? A: October 25th"); *see also* Polson Depo. at 90:9–18 (stating that as of October 26, 2012 L.A. Fitness was operating Global's clubs).

[96] *See* Polson Depo. At 115:20–116:20 (stating that she was not aware of either Global or L.A. Fitness ever breaching the APA and that she would have known if either party claimed the other had breached the APA); *see also* DeVary Depo. at 284:15–24 (stating that a closing date as late as October 31, 2012 would be a violation of the APA).

breach of the APA based on the date of closing, and because there was no breach of the APA, Global's claim for tortious interference with a contract fails as a matter of law.

Accordingly, independent of Global's disclaimer of its claim for tortious interference with a contract, Paramount is entitled to summary judgment as a matter of law on this claim because the APA was never breached.

### B. Kentucky Does Not Recognize a Claim For Reverse Tortious Interference with a Contract, Where the Litigants Are Parties to the Allegedly Interfered Contract.

Even if Global hadn't disclaimed tortious interference with a contract, and even if the APA had been breached, Global's claim fails because Kentucky does not recognize a claim for reverse tortious interference with a contract. Kentucky law requires that the allegedly interfering defendant cause a third party to breach. For example, under Kentucky law, it would be procedurally possible for L.A. Fitness to make a claim against Paramount for causing Global to breach the APA, or it would be procedurally possible for Global to sue Paramount for causing L.A. Fitness to breach the APA, but Global cannot sue Paramount for causing Global to breach the APA.

Under Kentucky law, for a claim of tortious interference with a contract "to be actionable, the plaintiff must show that a contract existed between it and a third party followed by a breach *by the third party*."[97] The breach must be caused by the defendant. A claim for tortious interference with a contract "requires [a defendant] causing a third party not to perform the contract."[98]

---

[97] *See* *Atmos Energy Corp. v. Honeycutt*, 2013 WL 285397 at *17 (emphasis added); *see also* *Indus. Equip.*, 554 F.2d at 289 ("Two of the necessary elements of this tort are the existence of a contract between the plaintiff and a third party and a subsequent breach of the contract by the third party.") (emphasis added).

[98] *Atmos*, 2013 WL 285397 at *19.

In *Atmos Energy Corp. v. Honeycutt*, the Kentucky Court of Appeals held that the plaintiffs' tortious interference claim failed because the plaintiffs, the Thorpe Parties, "failed to allege that Atmos caused a third party to breach a contract with [the Thorpe Parties]; rather, the Thorpe Parties reversed this element and sought recovery against Atmos for Atmos's alleged conduct in causing the Thorpe Parties to breach the terms of their oil and gas leases with [the third party,] the Landowners."[99] The court went on to expressly state that Kentucky law does not recognize this sort of "reverse" tortious interference claim.[100]

In *Atmos*, the Kentucky Court of Appeals rejected Restatement (Second) of Torts § 766A, which allows for "intentional interference with another's performance of his own contract." The *Atmos* court cited a decision from the U.S. District Court for the Western District of Kentucky, *CMI, Inc. v. Intoximeters, Inc.*,[101] which had predicted that Kentucky would reject § 766A of the restatement based on public policy.[102] The *CMI* court stated that:

> Kentucky courts have been very cautious in expanding unduly the tort remedies available to those in contractual relationships. There are sound reasons for this caution. The actual language of § 766A is so all encompassing and vague that to adopt it directly would cause tremendous confusion without creating a clear benefit. The conduct conceivably within its scope could be indistinguishable from the kind of unfettered commerce upon which courts have been reluctant to pass judgment. Moreover, the available remedies addres the most direct and readily identifiable harms. The torts discussed in § 766A necessarily involve highly speculative damages. Parties to contracts have a full array of contractual remedies to resolve inequities of performance caused by third persons. The Court is not persuaded that this new tort is necessary to correct a glaring inequity among commercial parties.[103]

---

[99] *Id.*

[100] *Id.* at 17–18.

[101] 918 F. Supp. 1068 (Ky. Ct. App. 1995)

[102] *Atmos*, 2013 WL 285397 at *18.

[103] *Id.* (citing *CMI, Inc.*, 918 F. Supp. at 1079–80).

The *Atmos* court adopted the *CMI* court's policy reasoning in rejecting a claim for reverse tortious, and Global has presented no reason to assume Kentucky would reverse course here.

Here, even if Global could show that Paramount's withholding of the Billing Information caused a breach of the APA, Global cannot show that it was a third party (i.e., L.A. Fitness) that breached. Indeed, Global does not even make such an allegation.[104] In its Amended Complaint, Global alleges that because of Paramount's actions, "*Global Fitness* was unable to perform its obligations under the APA."[105] Therefore, as pled by Global in its Amended Complaint, any breach of the APA was Global's own breach, the very kind of breach excluded by the Kentucky Court of Appeals as a basis for a claim of tortious interference with a contract. Global makes no allegation that L.A. Fitness did not perform under the APA. Because there is no evidence—or even allegation—that L.A. Fitness breached the APA, Global's claim is a claim for reverse tortious interference which is not permitted under Kentucky law.

Accordingly, independent of Global's disclaimer of its claim for tortious interference with a contract or the lack of a breach of the APA, Paramount is entitled to summary judgment as a matter of law on this claim. Any breach of the APA would have been Global's, but Kentucky requires that the defendant cause *a third party's* breach, rejecting claims of reverse tortious interference.

### C. Paramount Was Justified In Its Actions.

Beyond the other reasons for granting Paramount's Motion on Tortious Interference in favor of Paramount, Global's claim fails because Paramount's actions were justified.

---

[104] Amended Complaint ¶¶ 38–45.

[105] *Id.* ¶ 41 (emphasis added).

To succeed on a claim for tortious interference with a contract, the plaintiff must show that the defendant did not have a privilege or justification to excuse its conduct.[106] When a party is "asserting its own legitimate interests," it has "no obligation to consider the interests of any other party."[107] Kentucky law is clear: "Even if evidence is presented which would otherwise make a submissible case, the party whose interference is alleged to have been improper may escape liability by showing that he acted in good faith to assert a legally protected interest of his own."[108] "[A] claim for tortious interference cannot be sustained where a defendant is sued for exercising a right found in the parties' contract."[109]

Two cases are illustrative. First, in *NCAA*, the plaintiff hosted a weekly football television broadcast for a local television station.[110] The television station later contracted with the NCAA for the NCAA to broadcast football games on that station.[111] As part of that contract, the NCAA was given the right to approve or disapprove of any announcer used on the broadcasts.[112] The president of the station told the plaintiff that his name would be submitted to be used as a broadcaster for the games and that the plaintiff would be the analyst for those games.[113] Ultimately, the NCAA selected someone else to be the announcer for the games. A jury awarded the plaintiff $1,160,000 on the plaintiff's tortious interference claim, which was upheld by the

---

[106] *Snow Pallet,* 367 S.W.3d at 5–6.

[107] *Atmos*, 2013 WL 285397 at *20.

[108] *Nat. Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 858 (Ky. 1988).

[109] *Gulf Coast Farms, LLC v. Fifth Third Bank*, Nos. 2011-CA-000965-MR, 2011-CA-001575-MR, 2012-CA-000491-MR, 2013 WL 1688458 at *6 (Ky. Ct. App. April 19, 2013).

[110] *NCAA*, 754 S.W.2d at 856.

[111] *Id.*

[112] *Id.*

[113] *NCAA*, 754 S.W.2d at 856.

court of appeals.[114] The Kentucky Supreme Court reversed and concluded that the trial court

erred in failing to sustain the NCAA's motion for directed verdict.[115]

The Kentucky Supreme Court noted that to succeed on a claim for tortious interference, a

claimant must show that the interference was improper, which requires a showing of malice.[116]

The Supreme Court found that the plaintiff had failed to make such a showing.[117] However, the

court continued beyond the malice issue to discuss justification:

> Even if our conclusion about improper interference were otherwise, the NCAA
> would nevertheless prevail upon its defense under Restatement Section 773.
> The NCAA was entitled to assert "in good faith" its rights of announcer approval. This
> right had been bargained for and was an essential element in the contract with
> WTBS [the television station]. *The NCAA was entitled to assert its right even to
> the detriment of [the plaintiff's] prospective contractual relation.*[118]

Second, the Kentucky Court of Appeals reached the same conclusion in *Gulf Coast*.[119]

Gulf Coast, the counterclaimant, was in the business of training and racing horses.[120] Gulf Coast

contracted with Fifth Third Bank to provide financing to Gulf Coast, and Gulf Coast offered its

horses as collateral.[121] When Gulf Coast defaulted, Fifth Third Bank sold the collateral.[122] Gulf

Coast brought counterclaims against Fifth Third Bank, including a claim for tortious

interference. The court rejected this claim, stating that "Gulf Coast is prohibited at law from

using the torts of conversion and tortious interference to avoid the enforcement of Fifth Third

Banks's clear contractual rights; namely, the right to take possession of and sell the equine

---

[114] *Id.* at 855.

[115] *Id.*

[116] *Id.* at 858–59.

[117] *Id.* at 859.

[118] *Id.* at 860 (emphasis added).

[119] *See Gulf Coast*, 2013 WL 1688458 (Ky. Ct. App. Apr. 19, 2013).

[120] *Id.* at *1

[121] *Id.*

[122] *Id.*

collateral."[123] The court continued: "It has been held that a claim for tortious interference cannot be sustained where a defendant is sued for exercising a right found in the parties' contract."[124] The court further explained,

> This right [to sell the collateral] is unqualified under the terms of the contract. To allow Gulf Coast to claim that Fifth Third's rightful sale of collateral constituted a conversion of property and interfered with Gulf Coast's ability to sell the collateral for more money would be to allow them to modify the express terms of its contract with Fifth Third. Such a result is impermissible.[125]

Paramount argues that it cannot be liable for tortious interference because, in withholding the Billing Information, it was simply exercising its rights under the Contracts.[126] Global does not dispute that Paramount would not be liable for tortious interference by withholding the Billing Information if, in so withholding, Paramount was exercising a right under the Contracts.[127] Rather, Global's sole contention is that Paramount was not exercising a contractual right.[128] Specifically, Global argues that the "Contracts do not govern, much less discuss or even reference, how the Member Account[] Data, or more particularly how the Billing Information, should be transferred."[129] As such, Global concludes that Paramount's "argument that the Contracts provide Defendants with a legal defense to Global Fitness's tortious interference claim must fail because the Contracts between Paramount and Global Fitness do not cover the subject of the transference of the Member Account[] Data."[130]

---

[123] *Id.* at 6.

[124] *Id.*

[125] *Id.*

[126] Paramount's Motion on Tortious Interference at 21–23.

[127] Global's Opposition on Tortious Interference at 11, 20–24.

[128] *Id.*

[129] *Id.* at 20.

[130] *Id.* at 21.

This issue was resolved in the ruling granting Paramount's motion for summary judgment on Global's breach of contract claims.[131] More importantly, Global moved for and was granted leave to voluntarily dismiss the portion of its breach of contract claim related to Paramount's withholding of the Member Account Data,[132] thereby abandoning this argument. Under the Contracts, Paramount had the right and obligation to continue servicing the membership accounts until 45 days after Global provided its first written notice of termination on September 11, 2012, and therefore, Paramount clearly had the right to the Billing Information during the life of the Contracts, including the full 45-day termination period, because any other result would completely frustrate the fundamental purpose of the Contracts. Global had no right to end Paramount's possession or demand delivery of the Billing Information before the end of the 45-day period.

Following Global's termination of the Contracts on September 11, 2012, Paramount was justified in holding the Billing Information until October 26, 2012. Paramount transferred the complete set of the Member Account Data, including the Billing Information, to Global on October 11, 2012.[133] Therefore, because Paramount did not withhold the Billing Information any longer than it was contractually permitted, Paramount was exercising its contractual right and was justified in withholding the Billing Information, and Global cannot succeed on a claim for tortious interference based on that withholding.

---

[131] *See* Memorandum Decision and Order Granting In Part and Denying In Part [111] Defendants' Motion for Partial Summary Judgment on Plaintiff's Breach of Contract and Breach of the Implied Covenant Claims, docket no. 274, filed Aug. 31, 2015.

[132] *See* Memorandum Decision and Order Granting Plaintiff's Motion for Voluntary Dismissal with Prejudice, docket no. 244, filed Mar. 30, 2015.

[133] *See* Polson Depo. 189:9–190:14 (acknowledging that Paramount transferred the Member Account Data on October 11, 2012); Trawick Depo. at 262:19–23.

Accordingly, beyond the other reasons for granting summary judgment in Paramount's favor, Global's tortious interference claim also fails because Paramount's failure to transfer the Billing Information as demanded by Global was in keeping with and protecting Paramount's rights under the Contracts. Moreover, Global abandoned any argument Paramount breached the Contracts by retaining Member Account Data.

## II.      Global Cannot Succeed on A Claim for Interference with A Prospective Business Advantage.

To establish tortious interference with a prospective business advantage, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy, but not a contract; (2) that defendant was aware of this relationship or expectancy; (3) that defendant intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages.[134] Even if Global had stated a claim for tortious interference with a prospective business advantage instead of interference with a contract, Global's claim would fail for four reasons: (A) Global had a contract with L.A. Fitness, (B) L.A. Fitness entered into a business relation so any alleged interference did not actually prevent the business relation, (C) Kentucky would not recognize a claim for reverse tortious interference with a prospective business relation, and (D) Paramount's refusal to transfer the Member Account Data as demanded by Global was no improper because Paramount was exercising and protecting its rights and obligations under the Contracts.

### A.  Global Had A Contractual Relation with L.A. Fitness.

Even if Global had properly stated a claim for tortious interference with a prospective business advantage, that claim would fail because the relationship between Global and L.A. Fitness was governed by a contract: the APA.

---

[134] *Snow Pallet,* 367 S.W.3d at 5–6.

In Kentucky, the claims of tortious interference with a contract and tortious interference with a prospective business advantage are distinct and separate claims.[135] If there is an executed contract between the plaintiff and the third party with whose relationship the defendant allegedly interfered, a plaintiff's only potential tortious interference claim is one for interference with a contract. In such a case, a claim for tortious interference with a prospective business advantage will not stand.[136] Similarly, if there is no contract between the plaintiff and the third party, the plaintiff's only potential claim is one of interference with a prospective business advantage.[137]

In *Atmos*, one of the parties brought a claim for both tortious interference with contract and tortious interference with a prospective contractual relation.[138] With regard to the latter claim, the Kentucky Court of Appeals stated:

> The Thorpe Parties have also cited *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855 (Ky. 1988), which analyzed another variation of the tort of intentional interference recognized in Kentucky known as "intentional interference with prospective contractual relation," as decribed in the Restatement (Second) of Torts § 766B. However, this variation of intentional interference "is concerned only with intentional interference with prospective contractual relations, not yet reduced to contract." Because the oil and gas leases between the Thorpe Parties and the Landowners constituted existing contracts, this second variation also has no application to the case at bar.[139]

Similarly, because Global had a contractual relationship with L.A. Fitness, Global cannot succeed on a claim for interference with a prospective business advantage. As discussed

---

[135] *See Atmos*, 2013 WL 285397 at *17. *See also Kirby's Spectrum*, 744 F. Supp. 2d. at 1230 (stating that claims for tortious interference with contractual and business relations are "separate and distinct torts that must be analyzed independently.").

[136] *See Atmos*, 2013 WL 285397 at *17.

[137] *See Goodman v. Goldberg & Simpson, P.S.C.*, 323 S.W.3d 740, 745 (Ky. Ct. App. 2010) ("Therefore, the claim for intentional interference with the performance of a contract must fail as a matter of law because there was no contract.").

[138] *See Atmos*, 2013 WL 285397 at *17.

[139] *Id.* (quoting Restatement (Second) of Torts § 766B, comment (a)).

above,[140] Global has argued—and that argument has been rejected—that the APA was not a contract but was rather "guidelines" that gave Global and L.A. Fitness the option to consummate a deal in the future.[141] As already explained, the terms of the APA itself make it clear that the APA is a contract.[142] It is further clear that performance was rendered under that contract by both L.A. Fitness and Global,[143] and the APA closed on either October 25 or October 26, 2012.[144] The APA was not simply an option for Global and L.A. Fitness to potentially consummate a deal in the future: it was a binding contract.

Accordingly, even if Global had properly stated a claim for tortious interference with a prospective business relation, Paramount is entitled to summary judgment as a matter of law on this claim because Global had a contractual relationship with L.A. Fitness.

**B. Any Alleged Interference by Paramount Did Not Prevent the Business Relation from Coming to Fruition Because the Evidence Clearly Shows that L.A. Fitness Enter into a Business Relation with Global.**

Even if Global had properly stated a claim for tortious interference with a prospective business advantage, and even if the relationship between Global and L.A. Fitness was not governed by a contract, Global's claim would fail because Global cannot show that the

---

[140] *See supra* Part I.

[141] *See* Global's Opposition on Tortious Interference at 16.

[142] *See supra* Part I; APA, at § 5.4 ("With respect to each Seller, this Agreement and each of the Collateral Agreements to which such Seller is a party constitute legal, valid, and binding agreements of such Seller, enforceable against such Seller in accordance with their respective terms"); § 13.15 (expressly providing the parties with the right to seek injunctive relief and specific performance if the other party fails to perform its obligations under the APA); Recitals ¶ C ("Sellers have agreed to sell to Buyer the Assets"); § 4.1 ("stating that the closing "shall take place no later than on the fifth (5th) Business Day following the day on which the last to be satisfied or waived of the conditions set forth in Sections 8 and 9"); §10.1(b) (stating that the APA may be terminated "if there has been a breach of any representation, warranty, covenant or agreement by any Seller"); § 10.1(e) (stating that the APA may be terminated by either party if closing has not occurred by October 31, 2012 "for any reason other than delay or nonperformance of or breach by the party to this Agreement seeking such termination").

[143] *See* DeVary Depo. at 98:9–11 ("Q: Do you know the date that Global and L.A. Fitness actually closed? A: October 25th"); *see also* Polson Depo. at 90:9–18 (stating that as of October 26, 2012 L.A. Fitness was operating Global's clubs).

[144] *See id.*

prospective business relation did not come to fruition. The Global and L.A. Fitness deal closed on the transfer of Global's assets to L.A. Fitness.

To succeed on a claim for tortious interference with a prospective business advantage, the plaintiff must show that the potential business advantage was actually frustrated.[145] The Restatement (Second) of Torts, relied on by the Kentucky Courts, states that the interference must consist of "(a) inducing or inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation."[146] In other words, the plaintiff must show that the potential business advantage did not come to fruition. The evidence in this case does not support such a showing.

Even taking Global's argument as true that the APA was not a contract, but was mere "guidelines" for Global and L.A. Fitness in the event they wanted to finalize a deal in the future, Global and L.A. Fitness did indeed finalize a deal. It is undisputed that Global and L.A. Fitness finalized the sale of Global's assets to L.A. Fitness no later than October 26, 2012.[147] Thus, Global cannot show that Paramount's actions prevented L.A. Fitness from entering into or continuing a prospective relation with Global.

Global argues that while the APA did ultimately close, Paramount's actions interfered with Global's ability to close on the APA before October 16, 2012, thereby causing Global to lose money on the sale.[148] This argument is unpersuasive. Global has not cited any authority that the mere impairment of a prospective relation is actionable. Rather, Global must show that the prospective relation was never consummated, which it cannot do.

---

[145] See *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5–6 (Ky. Ct. App. 2012).

[146] Restatement (Second) of Torts § 766B.

[147] See DeVary Depo. at 98:9–11 ("Q: Do you know the date that Global and L.A. Fitness actually closed? A: October 25th"); *see also* Polson Depo. at 90:9–18 (stating that as of October 26, 2012 L.A. Fitness was operating Global's clubs). *See* Global Bill of Sale.

[148] Global's Opposition on Tortious Interference at 16.

Accordingly, beyond the other reasons, Paramount is entitled to summary judgment as a matter of law on this claim because Global cannot show that its prospective business relation with L.A. Fitness was prevented.

### C. Kentucky Would Not Recognize A Claim for Reverse Tortious Interference with a Prospective Business Relation.

Even if Global had properly stated a claim for tortious interference with a prospective business advantage, and independent of the other deficiencies stated above, Global's claim would fail because Kentucky would not recognize a claim for reverse tortious interference with a prospective business relation.

As discussed above,[149] under Kentucky law, for a tortious interference claim "to be actionable, the plaintiff must show that a contract existed between it and a third party" and that the defendant caused "a breach *by the third party*."[150] A claim for tortious interference "requires causing a third party not to perform the contract."[151]

In its Opposition, Global acknowledges that Kentucky law does not recognize a claim for reverse tortious interference in the context of a claim for interference with a contract, but argues that Kentucky would recognize a reverse tortious interference claim under a claim for interference with a prospective business relation.[152] In support of its position, Global cites Section 766B of the Restatement (Second) of Torts, which states:

---

[149] *See supra*, Part I(B).

[150] *See Atmos*, 2013 WL 285397 at *17 (unpublished) (emphasis added); *see also Indus. Equip.,*554 F.2d at 289 ("Two of the necessary elements of this tort are the existence of a contract between the plaintiff and a third party and a subsequent breach of the contract by the third party.") (emphases added).

[151] *Atmos*, 2013 WL 285397 at *19.

[152] Global's Opposition on Tortious Interference at 18–20.

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.[153]

Global further cites a case from the District of Minnesota which allowed a claim for reverse tortious interference, stating: "*In the absence of any Minnesota state cases* expressly or implicitly holding to the contrary, the court holds that a Minnesota court would not deviate from the Restatement by limiting the tort to interference which results from conduct directed toward a third party."[154]

Global's argument is nor persuasive. The Minnesota case cited by Global recognized that the law on this issue is different in other states.[155] In *State Nat'l Bank*, the court stated: "Illinois courts have stated that tortious interference with prospective business relations requires some conduct directed toward a third party through which defendants purposely cause that third party not to enter into or continue a prospective contractual relationship with plaintiff."[156] The court subsequently dismissed the counterclaimant's claim for interference with a potential business relation stating:

> the [counter-defendant's] conduct was directed only against [the counterclaimant] and its business assets.  There was no direct contact with, or interference involving, the relevant third parties.  All of the [counter-defendant's] actions secondarily affected the third party business relations only to the extent that they

---

[153] Global's Opposition on Tortious Interference at 18 (quoting restatement (Second) of Torts § 766B)).

[154] *Id.* (quoting *H Enters. Int'l v. General Elec. Capital Corp.*, 833 F. Supp. 1405, 1415 (D. Minn.1993)* (emphasis added)).

[155] *H Enters.*, 833 F. Supp. at 1415 (citing *State Nat'l Bank v. Academia, Inc.*, 802 S.W.2d 282, 296–97 (Tex. Ct. App. 1990).

[156] *State Nat'l Bank*, 802 S.W.2d at 296.

prevented [counterclaimant] from continuing its business and remaining in a position to maintain those relations.[157]

There appears to be a split of authority on this issue among the states. There is no Kentucky case law directly on point in a case involving reverse interference with prospective relations. But Kentucky has rejected the closely parallel claim for reverse tortious interference with a contract as discussed above.[158] It is highly likely that Kentucky would adhere to the same policy expression and require that, in raising a claim for tortious interference with a prospective business relation, the plaintiff must show that the defendant's actions were directed at a third party. Such a requirement would be consistent with the policy set forth in *Atmos* and *CMI*, which bars a claim for reverse tortious interference with a contract.[159]

As discussed above,[160] the evidence does not show that Paramount's actions were directed at a third party (i.e. L.A. Fitness). Indeed, Global does not even make such an allegation.[161] In its Amended Complaint, Global alleges that because of Paramount's actions, "Global Fitness was unable to perform its obligations under the APA."[162] Because there is no evidence—or even allegation—that Paramount's actions were directed at L.A. Fitness, Global's claim is a claim for reverse tortious interference, which claim would not be permitted under Kentucky law.

Accordingly, even if Global had properly stated a claim for tortious interference with a prospective business relation, and independent of all the other deficiencies stated above, Paramount would entitled to summary judgment as a matter of law on a claim for interference

---

[157] *Id.* at 297.

[158] *See supra* Part I(B).

[159] *Atmos*, 2013 WL 285397 at *17–19.

[160] *See supra* Part I(C).

[161] Amended Complaint ¶¶ 38–45.

[162] *Id.* ¶ 41.

with a prospective business relation because Global cannot show that Kentucky would recognize the reverse tortious interference with a prospective business relation.

**D. Paramount's Refusal to Transfer the Member Account Data Was Not Improper Because Paramount Was Justified in Exercising and Protecting its Rights Under the Contracts.**

Even if Global had properly stated a claim for tortious interference with a prospective business advantage, and independent of the other deficiencies stated above, Global's claim would fail because Paramount was justified in exercising and protecting its rights under the Contracts by refusing to transfer the Member Account Data as discussed at length above[163] and in the ruling on Paramount's motion on Global's breach of contract claim.[164]

**III.    Global's Claim for Punitive Damages Premised on Tortious Interference Must Necessarily Fail.**

In addition to seeking compensatory damages, Global further seeks to recover punitive damages in connection with its tortious interference claim.[165] Where Paramount is entitled to summary judgment as a matter of law on Global's underlying claim of tortious interference for the reasons discussed above, Paramount is also entitled to summary judgment as a matter of law on Global's request for related punitive damages.

---

[163] *See supra* Part I(C).

[164] *See* Memorandum Decision and Order Granting In Part and Denying In Part [111] Defendants' Motion for Partial Summary Judgment on Plaintiff's Breach of Contract and Breach of the Implied Covenant Claims, docket no. 274, filed Aug. 31, 2015.

[165] Amended Complaint ¶¶ 45, 80.

## ORDER

IT IS HEREBY ORDERED that Defendants' Motion for Partial Summary Judgment on Global's Tortious Interference Claim[166] is GRANTED. Global's claims for tortious interference and punitive damages based on that claim are hereby DISMISSED.


Dated August 31, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[166] Docket no. 120, filed under seal Aug. 4, 2014, redacted version in docket no. 123, filed Aug. 7, 2014.