IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GLOBAL FITNESS HOLDINGS, LLC,<br><br>Plaintiff,<br>v.<br><br>FEDERAL RECOVERY ACCEPTANCE, INC. and FEDERAL RECOVERY SERVICES, INC.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [121] DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM FOR LACK OF CAUSATION**<br><br>Case No. 2:13-cv-00204-DN<br><br>District Judge David Nuffer |

This case is a dispute between a former owner of physical fitness clubs and one of its billing services providers regarding the parties' obligations to each other at the termination of their contractual relationship. Plaintiff Global Fitness Holdings, LLC ("Global") filed this suit in October 2012 against two related entities (collectively "Paramount"), Federal Recovery Acceptance, Inc. ("FRAI") and Federal Recovery Services, Inc. ("FRSI"). Paramount provided the billing services for Global's large membership base. Global brought claims for tortious interference,[1] promissory estoppel,[2] conversion,[3] breach of contract,[4] and breach of the covenant of good faith and fair dealing.[5] All the claims arise out of the alleged refusal of Paramount to cooperate with Global when Global was acquired by Fitness & Sports Clubs, LLC ("L.A.

---

[1] Global Fitness Holding, LLC's Amended Complaint ("Amended Complaint") ¶¶ 38–45, docket no. 71, filed March 19, 2014.

[2] Id. ¶¶ 46–52.

[3] Id. ¶¶ 53–60.

[4] Id. ¶¶ 61–66.

[5] Id. ¶¶ 67–73.

Fitness"),[6] a non-party to this litigation. The tortious interference claim at the focus of this order is based on alleged interference with this acquisition.

In the Global–L.A. Fitness Asset Purchase Agreement ("APA"), Global was to transfer customer data to L.A. Fitness, but Global claims Federal Recovery wrongfully withheld the data pending Global's payment of termination fees to Federal Recovery.[7] Global also alleges Federal Recovery withheld over $500,000 in funds owed to Global.[8] Federal Recovery denies wrongdoing in withholding the data and funds, and has now filed several motions for summary judgment on all of Global's claims,[9] including the breach of contract claim related to data transfer that Global voluntarily dismissed.[10]

After discovery in this case concluded, Paramount filed several motions for summary judgment. This order GRANTS Paramount's motion[11] on Global's tortious interference claim based on a lack of causation.[12]

---

[6] *See generally id.*

[7] Amended Complaint ¶¶ 64–65.

[8] *Id.* ¶¶ 61–63, 65–66.

[9] Defendants' Motion for Partial Summary Judgment on Global's Promissory Estoppel Claim, docket no. 106, filed Aug. 4, 2014; Defendants' Motion for Partial Summary Judgment RE Plaintiff's Conversion Claim and Supporting Memorandum, docket no. 108, filed Aug. 4, 2014; Defendants' Motion for Partial Summary Judgment RE: Global's Breach of Contract and Breach of the Implied Covenant Claims and Memorandum in Support Thereof ("Breach Motion"), docket no. 111, filed Aug. 4, 2014; Defendants' Motion for Partial Summary Judgment on Global's Tortious Interference Claim, docket no. 120, filed under seal Aug. 4, 2014; and Defendants' Motion for Partial Summary Judgment RE: Global's Tortious Interference Claim for Lack of Causation and Memorandum in Support Thereof, docket no. 121, filed under seal Aug. 4, 2014.

[10] Global Fitness, LLC's Motion for Voluntary Dismissal of its Breach of Contract Claim Against Federal Recovery Acceptance, Inc. as it Relates to the Transfer of Data, docket no. 132, filed Sept. 4, 2014 ("Motion for Voluntary Dismissal").

[11] Defendants' Motion for Partial Summary Judgment RE: Global's Tortious Interference Claim for Lack of Causation ("Paramount's Motion on Causation"), docket no. 121, filed under seal Aug. 4, 2014; redacted version, docket no. 127, filed Aug. 7, 2014.

[12] Another motion sought dismissal of the same tortious interference claim on other grounds.

# TABLE OF CONTENTS

FACTUAL AND PROCEDURAL BACKGROUND.................................................................. 4

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................ 6

    I.        Standing, Element 2: A Causal Connection Is Necessary for Standing ................ 7

    II.      Tortious Interference: Proximate Causation Element.......................................... 17

SUMMARY JUDGMENT STANDARD.............................................................................. 17

APPLICABLE LAW ......................................................................................................... 18

ANALYSIS....................................................................................................................... 19

    I.        Global Lacks Article III Standing to Bring Its Tortious Interference Claim for
            Want of a Causal Connection. .................................................................... 20

           A.     Paramount Provided All of the Member Account Data on October 11,
                  2012, But Global Unilaterally Failed to Close the APA on or Before
                  October 15, 2012.................................................................................. 21

           B.     Global's Failures to Perform Its Express Obligations under the APA are
                  the Cause of Global's Alleged Injury. ..................................................... 22

    II.      Global's Tortious Interference Claim Also Fails on Proximate Cause................ 23

           A.     Paramount is Not the Proximate Cause of Global's Alleged Tort Injury, if
                  Any...................................................................................................... 25

                1.     Paramount Provided All of the Member Account Data, Including
                        the Billing Information, on October 11, 2012, and Global's Failure
                        to Close the APA within the Subsequent Four Days Cannot Be
                        Attributed to Paramount....................................................... 27

                2.     The Variable APA Purchase and Global's Financial Health Are the
                        Key Elements of the Cause of Global's Harm............................. 28

                3.     Global's Failure to Comply with Many of Its Obligations under the
                        APA, Wholly Independent of Paramount's Conduct, Ensured that
                        the Sale Would Not Close Before the Reduction in the Purchase
                        Price. ................................................................................. 30

           B.     Superseding Causes Cut Off Paramount's Liability, if Any..................... 35

                1.     Any Liability of Paramount's is Superseded by L.A. Fitness's
                        Autonomous discretion, contractual authority, and Significant
                        Financial Incentive to Postpone Closing....................................... 35

                  2.     Paramount's Contractual Right to Maintain the Member Account
                        Data During the 45-Day Termination Period Defeats Proximate
                        Cause. ................................................................................. 36

                  3.     Global's Steadily Declining Value, Which Predates the APA, is an
                        Intervening Cause of the Reduced Purchase Price. ...................... 38

                  4.     Global's Own Conduct, in Addition to Precluding Proximate
                        Cause from the Outset, Would Also Be a Superseding Cause. .... 39

    III.     Global's Claim for Punitive Damages Premised on Tortious Interference Is Also
            Dismissed. ............................................................................................ 40

ORDER ............................................................................................................................ 40

## FACTUAL AND PROCEDURAL BACKGROUND

At all relevant times prior to October 2012, Global owned and operated multiple fitness centers in multiple states.[13] Beginning in 2008, Global began contracting with FRAI for FRAI to process billing and collections for customers of certain Global facilities (the data processed by FRAI is the "Member Account Data").[14] The Member Account Data included not only information about the customers' purchases and preferences, but also their personal credit card ("CC") and bank account transfer ("ACH") information (collectively the "Billing Information") used to charge those customers for using Global's fitness centers.[15]

In 2008, Global and FRAI executed eight location-specific contracts (the "2008 Contracts");[16] in 2009, Global and FRAI executed two additional contracts: one amending the 2008 Contracts (the "Existing Locations Agreement") and another to govern all remaining locations (the "New Location Agreement");[17] and in 2011, Global and FRAI executed two more location-specific contracts (the "2011 Contracts")[18] (the 12 contracts collectively are the "Contracts" or the "Paramount Contracts"). FRAI, in turn, contracted with FRSI to perform the services necessary for FRAI to fulfill its obligations under the Contracts.[19]

---

[13] Amended Complaint ¶ 7.

[14] Defendants' Amended Answer to Plaintiff's Amended Complaint and Counterclaim ("Counterclaim") ¶ 19, docket no. 85, filed April 22, 2014. *See also* Contracts, collectively attached as Exhibit A to Paramount's Motion on Causation, docket no. 121-2, filed Aug. 4, 2014; three 2008 Contracts are attached as Exhibit E, docket no. 153-5, filed Sep. 5, 2014, to Unsealed Exhibits to Global Fitness Holding, LLC's Memorandum in Opposition to Federal Recovery Services Inc.'s Motion for Partial Summary Judgment RE: Global's Tortious Interference Claim for Lack of Causation ("Global's Exhibits on Causation"), docket no. 153, filed Sep. 5, 2014; four other 2008 Contracts are attached as Exhibit F to Global's Exhibits on Causation, docket no. 153-6, filed Sep. 5, 2014; the 2009 contract referred to herein as the "Existing Locations Agreement" is also attached as Exhibit H to Global's Exhibits on Causation, docket no. 153-8, filed Sep. 5, 2014; the 2009 contract referred to herein as the "New Locations Agreement" is also attached as Exhibit I to Global's Exhibits on Causation, docket no. 153-9, filed Sep. 5, 2014.

[15] Amended Complaint ¶ 9.

[16] Counterclaim ¶ 19; *see also* Contracts (dated 2008).

[17] Amended Complaint ¶ 13; Counterclaim ¶ 23, at 20–21; *see also* Contracts (dated 2009).

[18] Counterclaim ¶ 24, at p.21; *see also* Contracts (dated 2011).

[19] Amended Complaint ¶¶ 14–16; *see also* Contracts.

In its Amended Complaint, Global alleges "it had entered into an Asset Purchase Agreement (the "APA") with L.A. Fitness" under which "L.A. Fitness would purchase substantially all of the assets of Global."[20] Under the APA, Global "agreed to transfer all of [the] Member[] Account Data[, including the Billing Information,] to L.A. Fitness."[21] Global's Amended Complaint alleges that the Contracts between Global and FRAI mandated that FRAI service the Member Account Data and the associated Billing Information.[22] Nevertheless, Global contends that, having knowledge of Global's contractual relationship with L.A. Fitness through the APA, Paramount improperly withheld the Billing Information, thereby rendering Global "unable to perform its obligations under the APA."[23] To this end, Global's Amended Complaint asserts a claim for tortious interference because Paramount's "actions knowingly harmed Global[]'s APA with L.A. Fitness."[24] Global also asserts a claim for punitive damages premised on its tortious interference claim.[25]

Paramount filed its motion on causation on August 4, 2014. Paramount's Motion on Causation argues that there is a lack of causation between Paramount's alleged conduct and Global's alleged injury. Global filed an opposition[26] to Paramount's Motion on Causation on

---

[20] Amended Complaint ¶ 18.

[21] *Id.* ¶ 20.

[22] *Id.* ¶ 39, at Count I.

[23] *Id.* ¶¶ 28, 30–31, 33–34, 40–44, at Count I.

[24] *Id.* ¶¶ 38–45, at Count I.

[25] *Id.* ¶¶ 79–80, at Count VII.

[26] Global Fitness Holdings, LLC's Memorandum in Opposition to Federal Recovery Acceptance, Inc. and Federal Recovery Services Inc.'s Motion for Partial Summary Judgment RE: Global's Tortious Interference Claim for Lack of Causation ("Global's Opposition on Causation"), docket no. 151, filed under seal Sep. 5, 2014; redacted version, docket no. 158, filed Sep. 15, 2014.

September 4, 2014, and Paramount filed a reply memorandum[27] on September 22, 2014. Oral

argument on Paramount's Motion on Causation was held on May 11, 2015.[28]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The below collection of undisputed material facts is distilled from the above listed filings.

Paramount's Motion on Causation provided a statement of facts[29] and supporting exhibits.

Global's Opposition on Compensation responded to Paramount's statement of facts[30] and

provided a statement of additional facts[31] and its own set of exhibits.[32] Paramount's Reply on

Causation replied to Global's responses to Paramount's statement of facts[33] and responded to

Global's additional facts.[34]

An email was sent to counsel with a summary set of undisputed facts on May 8, 2015.[35]

That summary was reviewed at the start of the hearing on May 11, 2015.[36] The below collection

of undisputed facts was finalized following the April 27, 2015 hearing based on discussion at the

hearing.[37] The headings in the statement of facts are descriptive, not declaratory or substantive,

and they are taken from the elements as described in the parties' motions.

---

[27] Defendants' Reply Memorandum in Support of Motion for Partial Summary Judgment RE: Global's Tortious Interference Claim for Lack of Causation ("Paramount's Reply on Causation"), docket no. 171, filed under seal on Sep. 22, 2014; redacted version, docket no. 176, filed Sep. 24, 2014.

[28] *See* Docket no. 251, filed May 11, 2015 (Minute entry) and Transcript 5/11/15, docket no. 254, filed May 20, 2015.

[29] Paramount's Motion on Causation at 4–15.

[30] Global's Opposition on Causation at 10–18.

[31] *Id.* at 18–24.

[32] *See* Global's Exhibits on Causation.

[33] Paramount's Reply on Causation at iv–xxvii.

[34] *Id.* at xxviii–l.

[35] E-mail from Judge Nuffer's Chambers to counsel (May 8, 2015), lodged as docket no. 273 on Aug. 31, 2015.

[36] Transcript 5/11/15 32:1–43:15, docket no. 254, filed May 20, 2015.

[37] *Id.*

I.     **Standing, Element 2: A Causal Connection Is Necessary for Standing**

1.     Global and FRAI executed multiple contracts with each other regarding

Paramount's management of certain member accounts data.[38]

2.     Each of the Contracts between Global and FRAI contains the following

termination provision: "Contractor or Company may terminate this Agreement at any time for

any reason upon 45 day prior written notice."[39]

3.     On September 11, 2012, Keith Trawick, on behalf of Global, emailed Paramount

stating:

> Pursuant to the terms of our agreement with you, dated September 11, 2009, 45
> day notice is hereby given for the termination of the Agreement. As we discussed,
> the clubs have been sold to L.A. Fitness and at this time, we are unsure of the
> exact closing date. As specific information becomes available, we will let you
> know. It is our understanding that you guys will continue to provide service until
> the official closing date.[40]

4.     Six days earlier, on September 5, 2012, Global and L.A. Fitness executed a

certain Asset Purchase Agreement ("APA").[41]

5.     In the APA Global and L.A. Fitness agreed to an "Outside Date" of October 31,

2012 for closing the transaction contemplated by the APA.[42] However, they did not agree to any

specific "Closing Date" in the APA or at any time in writing prior to October 16, 2012.[43]

---

[38] *See* Contracts.

[39] *See id.* at section entitled "Term"; *see also* 30(b)(6) Deposition of Global, deponent Coby DeVary ("DeVary Depo.") at 12:24–13:24, relevant excerpts attached as Exhibit B to Paramount's Motion on Causation, docket no. 121-3, filed Aug. 4, 2014; other excerpts also attached as Exhibit E to Paramount's Motion on Causation, docket no. 121-6, filed Sep. 5, 2014; other excerpts also attached as Exhibit J to Global's Exhibits on Causation, docket no. 153-10, filed Sep. 5, 2014.

[40] *See* Sept. 11, 2012 email from K. Trawick to S. Nelson, et al. ("Sept. 11, 2012 Trawick Email"), attached as Exhibit C to Paramount's Motion on Causation, docket no. 121-5, filed Aug. 4, 2014; also attached as Exhibit N to Global's Exhibits on Causation, docket no. 153-14, filed Sep. 5, 2014.

[41] *See* APA at 1, attached as Exhibit D to Paramount's Motion on Causation, docket no. 121-5, filed Aug. 4, 2014; also attached as Exhibit W to Global's Opposition on Causation, docket no. 151-2, filed Sep. 5, 2014; *see also* DeVary Depo. at 129:4–5.

6.      As of the September 5, 2012 execution of the APA, Global and L.A. Fitness

agreed that the formula for calculating the "Gross Purchase Price" under the APA was

dependent, in part, on whether or not closing of the transaction occurred prior to October 16,

2012.[44]

7.      Specifically, "Gross Purchase Price" under the APA is defined as:

"Gross Purchase Price" means: (a) if the Closing occurs prior to October 16, 201
and August 2012 TTM Adjusted EBITDA is equal to or greater than the product
of (i) ninety percent (90%) multiplied by (ii) July 2012 TTM Adjusted EBITDA,
then "Gross Purchase Price" shall mean an amount equal to the July 2012 Gross
Purchase Price; (b) if the Closing occurs prior to October 16, 2012 and August
2012 TTM Adjusted EBITDA is less than the product of (i) ninety percent (90%)
multiplied by (ii) July 2012 TTM Adjusted EBITDA, then "Gross Purchase Price"
shall mean an amount equal to the August 2012 Gross Purchase Price, or (c) if the
Closing has not occurred prior to October 16, 2012, then "Gross Purchase Price"
shall mean an amount equal to the lesser of (i) the September 2012 Gross
Purchase Price, (ii) the August 2012 Gross Purchase Price or (iii) the July 2012
Gross Purchase Price.[45]

8.      While the formula for calculating the purchase price had the potential to change

depending on whether the APA closed before October 16, 2012, the outside closing date under

the APA was October 31, 2012.[46]

---

[42] *See* APA § 10.1(e), at 95 ("in the event the Closing has not occurred prior to October 31, 2012 (the 'Outside
Date') . . . [t]his Agreement and the transaction contemplated hereby may be terminated . . . by written notice . . . for
any reason other than delay or nonperformance of or breach by the party to this Agreement seeking such
termination"); *see also* Deposition of Royce Pulliam dated Mar. 21, 2014 ("Pulliam Depo.") at 92:3–93:2, 94:22–25,
relevant excerpts attached Exhibit F to Paramount's Motion on Causation, docket no. 121-7, filed Aug. 4, 2014; *see
also* DeVary Depo at 71:13–72:7, 184:15–17, 283:10–285:3; Sep. 3, 2012 E-mail from Coby DeVary to Kathryn
Polson, attached as Exhibit G to Paramount's Motion on Causation, docket no. 121-8, filed Sep. 5, 2014 ("The
outside closing date would be 10/31/2012").

[43] *See* APA § 4.1, at 36.

[44] *See id.* § 1, at 10, under definition of "Gross Purchase Price;" *see also* DeVary Depo. at 267:12–268:24.

[45] *Id.*

[46] *See id.*; *see also id.* at 95, § 10.1(e); *see also* DeVary Depo. at 71:13–72:7 (acknowledging that the "deal can still
go through and would be approved based on the terms of the asset purchase agreement if the closing date had
occurred by October 31, 2012"), 267:12–268:24 (discussing that a different purchase price formula may be used
depending on whether closing occurred before or after October 16, 2012); Pulliam Depo. at 92:3–93:2 and 94:22–25
(stating that October 31, 2012 was the date by which the parties could back out of the deal if closing had not
occurred).

9.      Specifically, Section 4.2(a) of the APA enumerates twenty-four (24) closing items that Global "shall deliver, or cause to be delivered" at or prior to closing.[47] Certain Subsections of Section 7 of the APA require further covenants from Global re: closing deliverables.[48] Such closing deliverables included, *inter alia*, tax clearance certificates; the Member Account Data (aka "EFT Customer Information"); subordination, non-disturbance and attornment agreements ("SNDAs"); lease assignments; zoning conformance reports; and payoff letters.[49] Section 8 of the APA reiterates that such closing deliverables are "Conditions to Obligations of [L.A. Fitness]".[50]

10.     Subsection 4.1 of the APA further provides that closing of the transaction contemplated by the APA

> shall take place no later than on the fifth (5th) Business Day following the day on which the last to be satisfied or waived of the conditions set forth in Section[] 8 ... shall be satisfied or waived in accordance with this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, it being understood that the occurrence of the Closing shall remain subject to the satisfaction or waiver of such conditions at the Closing) or such other date as[L.A. Fitness] and Global may agree to in writing (such date being referred to herein as the "Closing Date")....[51]

11.     As of Friday, October 5, 2012, L.A. Fitness complained in writing to Global that certain closing deliverables remained open that were "time intensive and ha[d] the potential for delaying closing," including:

---

[47] *See* APA § 4.2(a), at 36–39.

[48] *See id.* § 7 *et seq.*, at 74–90.

[49] *See, e.g., id.* §§ 4.2(a), 7 and 8 *et seq.*, at 36–39 and 74–93; *see also* E-mail from Robert Wilson of L.A. Fitness ("Oct. 5, 2012 Wilson Email"), attached as Exhibit J to Paramount's Motion on Causation, docket no. 121-11, filed Aug. 4, 2014.

[50] APA § 8, at 90.

[51] *Id.* § 4.1, at 36.

a.      Tax clearance certificates from Ohio, North Carolina, Pennsylvania, or Tennessee as required by APA § 4.2(a)(xxiii);[52]

b.      Any affidavits stating the amount of all taxes, penalty, and interest due as required by APA § 4.2(a)(xxii);[53]

c.      EFT customer information due 14 days prior to closing date as required by APA §§ 7.11(d) and 8.17 (a closing condition requiring compliance with the 14-day deadline in § 7.11) (L.A. Fitness notes that even delivery of the Motionsoft EFT Customer information on Oct. 5, 2012 is "clearly inconsistent with Seller [sic] stated desire to close this transaction by October 15, 2012");[54]

d.      Subordination and non-disclosure agreements as required by APA § 4.2(a)(xix) ("important to [L.A. Fitness] and were included as a closing condition for that reason");[55]

e.      Lease assignments as required by APA §§ 4.2(a)(v), (xx) and 7.9 (noting that the delay "is reflective of the fact that Sellers have not used their best efforts in obtaining such Lease Agreements");[56]

f.      Zoning conformance reports due 5 days prior to closing as required by APA § 4.2(a)(vi);[57] and

g.      Payoff letters due 5 business days prior to closing as required by APA § 7.22.[58]

---

[52] *See* Oct. 5, 2012 Wilson Email at numeral I.

[53] *Id.*

[54] *See id.* at numeral II.

[55] *See id.* at numeral III.

[56] *See id.* at numeral IV.

[57] *See id.* at numeral V.

12.     Moreover, regarding the Member Account Data managed by Paramount and the

Contracts between Global and Paramount, Subsection 7.11(d) of the APA states:

> At least fourteen (14) days prior to the Closing Date, [Global] shall be responsible
> for the transfer of all customer account (other than each customer's name,
> address, telephone number, facsimile number and email address) and EFT
> Payment data (including, without limitation, all Present Member status and billing
> and customer service history) from [Global's] electronic fund transfer system to
> [L.A. Fitness's] electronic fund transfer system (collectively, "EFT Customer
> Information") and shall continue to assist Buyer until such data transfer is
> complete. At least three (3) Business Days prior to the Closing Date, [Global]
> shall transfer customer account data that includes each customer's name, address,
> telephone number, facsimile number and email address. In addition, Sellers shall
> terminate Sellers' EFT Provider Service Agreements as they pertain to the Present
> Membership Agreements or and other EFT Payments received on account of or
> related to the Business, and Sellers shall, and shall direct Sellers' EFT Providers
> to, cease servicing the Present Membership Agreements, on the later to occur of
> (i) the Closing Date or (ii) the date on which the transfer to Buyer's electronic
> fund transfer system of all EFT Payments made with respect to Present
> Membership Agreements has been completed (provided such date shall occur no
> later than ninety (90) days after the Closing Date). Sellers shall, and shall direct
> Sellers' EFT Providers to, assist Buyer in transferring all customer account
> (which, from the date that is at least three (3) Business Days prior to the Closing
> Date, shall include, without limitation, name, address, telephone number,
> facsimile number and email address) and EFT Payment data (including, without
> limitation, all Present Member status and billing and customer service history) to
> Buyers' electronic fund transfer system. Sellers shall be responsible for all costs
> and expenses associated with transferring and terminating Sellers' electronic fund
> transfer system and Sellers' EFT Provider Service Agreements as provided in this
> Section 7.11 (including, without limitation, (i) any and all cancellation fees,
> accumulated late fees, banking fees and any and all other fees, charges or
> expenses which may arise or be charged or assessed in connection with such
> transfer and/or termination, and (ii) all costs, fees and expenses listed in the
> Sellers' EFT Provider Service Agreements). . . . [59]

13.     Subsection 8.17 of the APA further provides that a condition of L.A. Fitness to

buy Global's assets was that Global "shall have provided all of the EFT Customer Information

---

[58] *See id.* at numeral VI.

[59] *Id.* § 7.11(d), at 83–84; *see also* Oct. 5, 2012 Wilson Email.

… to [L.A. Fitness] in accordance with, and within the time periods specified in, Section 7.11(d)."[60]

14.     Section 8 of the APA states that, while L.A. Fitness, in its sole discretion, could "waive any or all of these conditions in writing[,]" "[t]he obligation of [L.A. Fitness] to consummate the transactions contemplated by this Agreement is subject to the satisfaction, [at or] before the Closing … of all conditions set forth in this Article 8."[61]

15.     Section 2.5 of the APA states that if the consent to assign third party contracts

cannot be obtained prior to the Closing, the Sellers shall, unless and until Buyer expressly requests otherwise in writing, hold such [contract], and as of and from the [closing], for Buyer in order for Buyer to obtain the benefits thereunder and cooperate with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.62

16.     Section 7.7 requires that

each party use its reasonable, good faith efforts to perform its obligations hereunder and . . . cause the transaction contemplated herein to be effected as soon as practicable. . . and shall cooperate fully with each other party and its representatives in connection with any step required to be taken as a part of its obligations hereunder. . . .63

17.     Before October 3, 2012, Paramount provided Global with all requested Member Account Data including weekly productions during the final months of the contracts and

---

[60] *Id.* § 8.17, at 93; *see also* Oct. 5, 2012 Wilson Email.

[61] *See id.* § 8, at 90; *see also, e.g., id.* §§ 8.2, at 91–93 ("Each of the covenants and obligations set forth herein that [Global is] required to comply with or perform at or prior to the Closing shall have been complied with or performed in all material respects.") and § 8.14 ("At the Closing, [L.A. Fitness] shall have received each of the documents, certificates, instruments, and agreements … and other items required to be delivered to [L.A. Fitness] pursuant to Section 4.2(a)…')); Oct. 5, 2012 Wilson Email (outlining "certain open closing deliverables … that are time intensive and have the potential for delaying closing" but where "are important to [L.A. Fitness] and were included as a closing condition for that reason").

[62] APA § 2.5, at 31.

[63] *Id.* at § 7.7, at 80.

productions after Global provided notice to terminate the Contracts; CC and ACH information was not included.[64]

18.    The first date that Global made a written request to Paramount to transfer all of the Member Account Data that it was processing for Global was October 3, 2012, via email.[65]

19.    L.A. Fitness's receipt of the Motionsoft full cut on October 5, 2012 provided L.A. Fitness with enough time to incorporate the data for a close on October 15, 2012.[66]

20.    When Global made a demand on October 3, 2012 for the return of its Member Account Data, including the billing information, internal correspondence from Paramount, spanning from October 3, 2012 to October 11, 2012, establishes that they were concerned that if they provided the requested data they would be unable to collect their termination fees.[67]

21.    Specifically Defendants stated in e-mail correspondence:

        a.    "If we give them a full cut we'll never get any money from them . . . ."[68]

        b.    "Please check and recheck all files we are sending to [Global Fitness] to make sure we DO NOT include the banking information!"[69]

---

[64] See Sep. 10, 2012 Email chain from Glen Bendixen to Todd Rasmussen, et al., attached as Exhibit DD to Global's Exhibits on Causation, docket no. 153-25, filed Sep. 5, 2014 ("The export is already getting posted every Wednesday for [Global] on the FTP site."); see also Counterclaim ¶¶ 46–47, at 25–26.

[65] See Oct. 3, 2012 email from Keith Trawick to Sid Nelson, et al., attached as Exhibit K to Paramount's Motion on Causation, docket no. 121-12, filed Aug. 4, 2014; also attached as Exhibit P to Global's Exhibits on Causation, docket no. 153-16, filed Sep. 5, 2014, ("We are asking for a full cut of the data on Friday. . . .  Please confirm. Also, we will need an additional (updated) cut of the same data on the date of the actual close, which we anticipate will be next week."); see also Amended Complaint ¶ 28 ("On October 3, 2012, Global[] requested that Paramount transfer the Billing Data or final cut back to Global. . . .").

[66] 30(b)(6) Deposition of L.A. Fitness, deponent Kathryn Polson ("Polson Depo.") at 248:23–249:3, relevant excerpts attached as Exhibit M to Paramount's Motion on Causation, docket no. 121-14, filed Aug. 4, 2014; other portions also attached as Exhibit FF to Global's Exhibits on Causation, docket no. 153-27, filed Sep. 5, 2014.

[67] See infra nn.68–71.

[68] Oct. 3, 2012 E-mail chain from Glen Bendixen to Sid Nelson et al., attached as Exhibit II to Global's Exhibits on Causation, docket no. 153-30, filed Sep. 5, 2014.

[69] Oct. 5, 2012 E-mail chain from Todd Rasmussen to Glen Bendixen, attached as Exhibit JJ to Global's Exhibits on Causation, docket no. 153-31, filed Sep. 5, 2014.

c.       "Prior to shutting of [Defendants] system, the required payments to

[Defendants] and reserves for contingencies must be agreed upon and paid."[70]

d.       "I think [Global Fitness and L.A. Fitness] are trying to sign tomorrow or

Friday leaving us no ability to build up a reserve. The billing info is the only card we

have left."[71]

22.       Paramount transferred the complete set, or "full cut," of membership accounts

data to Global on October 11, 2012.[72]

23.       On the morning of October 11, 2012, Kathy Polson of L.A. Fitness informed

Coby DeVary of Global Fitness that because Global did not have the Paramount data, Global

would not be in a position to close on October 15.[73] Ms. Polson testified that the APA did not

close on October 15, 2012 because L.A. Fitness did not have all of the items it needed for

closing, including, in addition to the Paramount Member Account Data, lease assignments,

schedules, payoff letters, SNDAs, and documentation regarding subtenants.[74] Ms. Polson

specifically testified that even if L.A. Fitness had the Paramount data, closing still would not

have occurred on October 15, 2012 because of all of the other items Global had failed to

provide.[75]

---

[70] Oct. 9, 2012 E-mail from Thomas Klc, attached as Exhibit S to Global's Exhibits on Causation, docket no. 153-19, filed Sep. 5, 2014.

[71] Oct. 3, 2012 E-mail from Todd Rasmussen to Glen Bendixen, attached as Exhibit Q to Global's Exhibits on Causation, docket no. 153-17, filed Sep. 5, 2014.

[72] See Oct. 11, 2012 Email from K. Trawick to S. Horton-Salcedo, et al., attached as Exhibit L to Paramount's Motion on Causation, docket no. 121-13, filed Aug. 4, 2014 ("The PAC data is available on your FTP site."); see also Polson Depo. at 189:9–190:14 (acknowledging that Paramount transferred the Member Account Data on October 11, 2012); Deposition of Keith Trawick ("Trawick Depo.") at 262:19–23, attached as Exhibit n to Paramount's Motion on Causation, docket no. 121-15, filed Aug. 4, 2014; other portions also attached as Exhibit Y to Global's Exhibits on Causation, docket no. 153-23, filed Sep. 5, 2014.

[73] Polson Depo. at 249:8–12; DeVary Depo. at 98:5–8.

[74] See Polson Depo. at 132:14–136:9.

[75] See id. at 135:24–136:9.

24.     Irrespective of the membership account data, as of October 15, 2012, Global had not satisfied all of the closing conditions set forth in the APA. Waivers of some conditions had been negotiated. L.A. Fitness had not executed a written waiver of any of these items:

a.     Global had not provided to L.A. Fitness at least some lease assignments.[76]

b.     Global had not provided to L.A. Fitness at least some SNDAs or recognition agreements.[77]

c.     Global had not provided to L.A. Fitness at least some tax clearance certificates.[78]

d.     Global had not provided to L.A. Fitness at least some payoff letters.[79]

e.     Global had not provided to L.A. Fitness the final purchase price calculation.[80]

f.     Global had not completed other un-waived closing conditions.[81]

25.     L.A. Fitness's Rule 30(b)(6) designee testified as follows:

Q.     So even if Global [] had received all the Paramount [Membership Account Data] that it needed prior to October 15, 2012, it could not close on that date because it didn't have lease assignments, including SNDAs, payoff letters, and the final purchase price calculation that it needed from Global [] under the APA?

A.     Yes.[82]

---

[76] *Id.*; *see also* 132:7–136:9.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] Polson Depo at 132:11–23 (identifying other "lease-related documents . . . that Global Fitness needed to provide to LA Fitness" but had not); *see also id.* at 133:1–17 (identifying missing "schedules required" for "payoff notices," as well as reiterating that "the final calculation of the purchase price" had yet to be provided as of October 15, 2012); *id.* at 134:8–12 (identifying "documentation regarding some of the subtenants that [L.A. Fitness still] needed to receive," as well as "certificates of occupancies" and other associated "reports allowing [L.A. Fitness] to do business in those sites") and *id.* at 135:12–15 ("certificate[s] of occupancy . . . would be one of the items that we would need to close" and "[w]e did not have those as of [October 15, 2012]").

26.     As of at least September 3, 2012—prior to signing the APA—L.A. Fitness knew that Global's earnings were declining:

Q.      Do you know why LA Fitness and Global [] agreed to this terms – to these terms per your email here?

A.      As we progressed through the negotiations and we were getting financial statements from [Global] and we saw what was happening to the earnings, the EBITDA, we saw how that was declining and we wanted – we, LA Fitness, wanted to make sure that since our price is based on a multiple of EBITDA, that we would not be getting substantially lower EBITDA in the for – in the time period that we were – we were owning and operating the company. So we built in these terms to help protect us should the EBITDA drop significantly.[83]

27.     Ultimately, the transaction contemplated by the APA closed on October 25, 2012, six days prior to the Outside Date for closing.[84]

28.     As of October 25, 2012, Global had still not satisfied all of the closing conditions under the APA. However, at that time, L.A. Fitness executed a formal amendment of the APA in order to defer, resolve, or waive, in writing, Global's obligation to complete those items prior to closing,[85] as required by the APA.[86]

29.     By closing after October 15, 2012, L.A. Fitness was able to acquire Global's assets at a savings of nearly $10 million dollars.[87]

30.     In its Amended Complaint, Global alleges that:

a.      Paramount's "actions deprived Global Fitness of . . . its ability to comply with its obligations under the APA with L.A. Fitness."[88]

---

[82] *Id.* at 135:24–136; *see also* 132:7–136:9.

[83] *Id.* at 72:20–73:7.

[84] *See* DeVary Depo. at 98:9–11 ("Q. Do you know the date that Global and LA Fitness actually closed? A. October 25th."); *see also* Polson Depo. at 90:9–18 (stating that as of October 26, 2012 L.A. Fitness was operating Global's clubs); Amended Complaint ¶ 35.

[85] Second Amendment to the APA, attached as Exhibit SS to Global's Exhibits on Causation, docket no. 153-39, filed Sep. 5, 2014; *see also* Polson Depo. at 249:13–250:2.

[86] *See* APA § 8, at 90 (L.A. Fitness "may waive any or all of these conditions in writing . . . .").

[87] *See* DeVary Depo. at 95:9–10.

      b.     "Instead of closing on October 15, 2012, Global Fitness was unable to close the APA with L.A. Fitness until October 25, 2012 because of the actions of Paramount."[89]

      c.     "As a result of the delay caused by Paramount . . . the purchase price of the APA decreased dramatically."[90]

      d.     "As the direct and proximate cause of the acts and omissions of Paramount . . . Global Fitness was unable to perform its obligations under the APA."[91]

      e.     "Paramount . . . interfered and threatened Global Fitness's business relationship with L.A. Fitness."[92]

## II.    Tortious Interference: Proximate Causation Element

31.    The preceding paragraphs 1–30 are incorporated by reference as if fully set forth herein anew as all such undisputed material facts pertain to proximate causation in relation to Global's tortious interference claim.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[93] "An issue of material fact is 'genuine' if a reasonable jury could return a verdict for the nonmoving party."[94] In moving for summary judgment, Paramount "bears the burden of showing the absence of a

---

[88] Amended Complaint ¶ 34, at 7.

[89] *Id.* ¶ 35, at 7.

[90] *Id.* ¶ 36, at 7.

[91] *Id.* ¶ 41, at 8.

[92] *Id.* ¶ 42, at 8.

[93] Fᴇᴅ. R. Cɪᴠ. P. 56(a).

[94] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).

genuine issue of material fact . . . ."[95] However, Paramount "need not negate [Global's] claim[s], but need only point out to the district court 'that there is an absence of evidence to support [Global's] case.'"[96] Upon such a showing, Global "must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which [Global] carries the burden of proof."[97] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to defeat a properly supported motion for summary judgment."[98] And "mere supposition and speculation are insufficient for a case to survive the summary judgment stage."[99] When applying the forgoing standards, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[100]

## APPLICABLE LAW

Global originally filed this case in the United States District Court for the Eastern District of Kentucky.[101] Federal jurisdiction in this case is premised on diversity.[102] Venue was subsequently transferred to the District of Utah.[103] The parties have stipulated and agreed that Kentucky substantive law applies to Global's claim for tortious interference.[104] Nevertheless,

---

[95] *Universal*, 22 F.3d at 1529.

[96] *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[97] *Id.* (quoting *Anderson*, 477 U.S. at 256 (internal quotation marks omitted)) (both emphases in original).

[98] *Id.* (quoting *Anderson*, 477 U.S. at 252 (internal quotation marks omitted)).

[99] *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012).

[100] *Id.* (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990)) (internal quotation marks omitted).

[101] *See e.g.*, Paramount's Motion on Causation at 14; Global's Opposition on Causation at 27.

[102] *See* 28 U.S.C. § 1332(a); *see also* Complaint ¶ 3, docket no. 1, filed Oct. 10, 2012 ("This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as it involves citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.").

[103] Memorandum Opinion & Order, docket no. 34, filed Mar. 20, 2013.

[104] *See e.g.*, Global's Motion for Partial Summary Judgment on Paramount's Fraud and Negligent Misrepresentation Counterclaims at 13–15, docket no. 66, filed Mar. 4, 2014; Paramount's Motion on Causation at 15.

while Kentucky substantive law applies to the claim at issue, federal law governs procedural

questions and the applicable standard of review.[105] Moreover, federal law also governs

determinations of standing. The plaintiff must satisfy the Article III standing requirements of

injury-in-fact, causation, and redressability irrespective of substantive state law applicable in

diversity.[106]

## **ANALYSIS**

Standing is a constitutional, threshold requirement grounded in the provision of Article

III of the United States Constitution. Article III limits the jurisdiction of federal courts to cases

and controversies.[107] To demonstrate standing, Global bears the burden of establishing that it

"suffered and injury-in-fact – an invasion of a legally protected interest," that there is a "causal

connection between [Global's] injury and the conduct [of Paramount] complained of," and that it

is "likely, as opposed to merely speculative, that [Global's] injury will be redressed by a

favorable decision."[108] In response to Paramount's Motion on Causation, Global cannot rely on

mere allegations, but must set forth, by affidavit or other evidence, specific facts establishing

standing.[109] "[E]ach element of standing must be supported in the same way as any other matter

on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence

required at the successive stages of the litigation."[110] Federal courts have an independent

---

[105] *E.g., Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010).

[106] *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2667–68 (2013).

[107] *See Allen v. Wright*, 468 U.S. 737, 750 (1984); *Asarco Inc. v. Kadish*, 490 U.S. 605, 613 (1989); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998); and *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[108] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–62 (1992); *see also Steel Co.*, 523 U.S. at 102–103.

[109] *See* FED. R. CIV. P. 56; *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

[110] *Lujan*, 504 U.S. at 561.

obligation to examine their own jurisdiction, and standing is as important as any jurisdictional doctrine.[111]

 In its Amended Complaint, Global contends that Paramount, having knowledge of Global's contractual relationship with L.A. Fitness, improperly withheld the Billing Information, thereby rendering Global "unable to perform its obligations under the APA."[112] Global's claim for tortious interference alleges that Paramount's "actions knowingly harmed Global[]'s APA with L.A. Fitness."[113] Global also asserts a claim for punitive damages premised on this tortious interference claim.[114] As discussed below, Global's claim for tortious interference fails and Paramount is entitled to judgment as a matter of law because Global has failed to show (I) a causal connection between its alleged injury and Paramount's conduct and (II) that Paramount's conduct proximately caused Global's alleged injury.

### I. Global Lacks Article III Standing to Bring Its Tortious Interference Claim for Want of a Causal Connection.

 As stated above, the second element of standing under Article III's case-or-controversy requirement constitutes traceability or "causation."[115] Global must satisfy the "causation" prong of Article III as a threshold matter by showing that its alleged injury "fairly can be traced" to Paramount's conduct.[116] Simply put, standing requires that there be a causal connection between Global's asserted injury and Paramount's allegedly tortious conduct.[117] To the extent that

---

[111] *See* id. (although neither side raised issue, courts are required to address standing even if courts below have not passed on it).

[112] Amended Complaint ¶¶ 28, 30–31, 33–34, 40–44, at Count I.

[113] *Id.* ¶¶ 38–45, at Count I; *id.* ¶¶ 34–36, at 7, ¶¶ 41–42, at 8.

[114] *Id.* ¶¶ 79–80, at Count VII.

[115] *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982).

[116] *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

[117] *See, e.g., Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) ("The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true."); *see also D.L. v. Unified*

Global's injury is self-inflicted or is due to Global's own conduct, the causal chain is broken.[118]

In Global's Opposition on Causation, Global argued limits associated with prudential

standing;[119] however, the doctrine of prudential standing is not at issue.

Applying these standards, Global's tortious interference claim fails, as a matter of law,

where Global's alleged tort-based harms cannot fairly be traced to Paramount's alleged

actions.[120]  Based on the undisputed facts, Global cannot sustain its burden to demonstrate

standing for two reasons: (A) Paramount provided all of the Member Account Data on October

11, 2012 but Global still failed to close the APA on or before October 15, 2012 and (B) Global's

failures to perform its express obligations under the APA are the cause of Global's alleged

injury. Therefore, Paramount is entitled to summary judgment as a matter of law on Global's

tortious interference claim.

### A.  Paramount Provided All of the Member Account Data on October 11, 2012, But Global Unilaterally Failed to Close the APA on or Before October 15, 2012.

It is undisputed that Paramount transferred, under injunctive order, the complete set, or

"full cut," of Member Account Data to Global on October 11, 2012.[121] Nevertheless, Global was

still unable to close on the transfer of its assets under the APA on or before October 15, 2012.[122]

Because Paramount transferred the Member Account Data four days prior to the trigger date of

October 15, Global's failure to close by that date cannot be attributed to Paramount. Likewise,

---

*Sch. Dist. No. 497*, 596 F.3d 768, 774–75 (10th Cir. 2010) (plaintiffs lacked standing because they were unable to show that children's absence from school was caused by defendant's allegedly discriminatory conduct).

[118] *See McConnell v. FEC*, 540 U.S. 93, 228 (2003), *overruled on the grounds, Citizens United v. FEC*, 558 U.S. 310 (2010) (plaintiffs lacked standing to challenge election reform law because injury stemmed from plaintiffs' personal choice rather than from statute).

[119] *See* Global's Opposition on Causation at 24–27.

[120] *See Whitmore*, 495 U.S. at 155.

[121] *See* Statement of Undisputed Material Facts, *supra* ¶ 22.

[122] *Id.* ¶¶ 23–28.

the consequences of Global's failure to close the APA on or before October 15, 2012, consequences specifically negotiated and bargained for in the APA,[123] cannot be attributed to Paramount.

Accordingly, Paramount is entitled to summary judgment as a matter of law on Global's tortious interference claim because Global's failure to close the APA on or before October 15, 2012 cannot be fairly traced to Paramount's transfer of the Member Account Data where Global had the Member Account Data on October 11, 2012, four days prior to the October 15, 2012 variable purchase price deadline.

## B. Global's Failures to Perform Its Express Obligations under the APA are the Cause of Global's Alleged Injury.

Independent of Paramount's transfer of the Member Account Data prior to October 15, 2012, Global's own failure to meet the requirements of the APA, a binding contract, prevent Global from meeting the standing doctrine's requirement of showing a causal connection between Global's injury and Paramount because self-inflicted injuries break the causal chain.[124]

The APA imposed a number of closing conditions upon Global, many of which remained outstanding as of October 15, 2012, and even as late as October 25, 2012.[125] These incomplete closing obligations were wholly independent of Parmaount's transfer of the Member Account Data on October 11, 2012.[126] Global's incomplete APA obligations included various lease assignments, SNDAs or recognition agreements, zoning conformance reports, tax clearance certificates, payoff letters, purchase price calculations, and so forth, all of which Global was

---

[123] *Id.* ¶¶ 4–8, 23–29.

[124] *See* *McConnell, 540 U.S. at 228*.

[125] *See* Statement of Undisputed Material Facts, *supra* ¶¶ 9–14, 16, 18, 23–25, 27–29.

[126] *Id.* ¶ 22.

independently responsible for completing under the APA.[127] It is undisputed that Global failed to complete or obtain a written waiver of these items, as required by the APA, before October 15, 2012.[128] This undisputed fact breaks any causal connection between Paramount's conduct and Global's alleged injury and, therefore, destroys Article III standing.

Not only did Global fail to satisfy numerous APA obligations irrespective of the Member Account Data, Global failed to even request the Membership Account Data from Paramount "[a]t least fourteen (14) days prior" to October 15, 2012 as required by the APA.[129] Global's failure to timely request the Member Account Data is not traceable, fairly or otherwise, to Paramount's conduct. Thus, Global's own failure to satisfactorily comply with the APA is a self-inflicted injury that breaks the causal chain.[130]

Accordingly, regardless of Paramount's transfer of the Member Account Data in advance of the October 15, 2012 adjustable purchase price deadline, Paramount's conduct also cannot be fairly traced or causally connected to Global's alleged harm, and therefore, Paramount is entitled to judgment as a matter of law.

## II.   Global's Tortious Interference Claim Also Fails on Proximate Cause.

Similar to the standing doctrine's causation requirement, "[i]n Kentucky, intentional torts require proving proximate cause."[131] Kentucky law recognizes two separate claims for tortious interference: interference with a contract,[132] and interference with a prospective business

---

[127] *Id.* ¶¶ 9–14, 16, 18, 23–25, 27–29.

[128] *Id.* ¶¶ 24, 28; *see also id.* ¶¶ 23, 25.

[129] *See id.* ¶¶ 11(c), 12–13, 18.

[130] *See McConnell, 540 U.S. at 228.*

[131] *Ventas, Inc. v. Health Care Prop. Investors, Inc., 635 F. Supp. 2d 612, 624 (W.D. Ky. 2009)* (citing *Ky. Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc., 24 F. Supp. 2d 755, 762* n.1 (W.D. Ky. 1998)).

[132] To sustain a claim for tortious interference with contract, Global bears the burden of proving the following elements: (1) the existence of a contract; (2) [Paramount's] knowledge of the contract; (3) that [Paramount] intended to cause a breach of that contract; (4) that [Paramount]'s actions did indeed cause a breach; (5) that damages resulted

advantage.[133] Whether its claim is one for interference with a contract or interference with a prospective business advantage, Global bears the burden of proving that Paramount's conduct was the proximate cause, i.e., a "substantial factor," in bringing about Global's alleged injury in tort.[134]

Not only must Global prove that it "actually suffered damages as a result of [Paramount's] actions,"[135] "[p]roximate cause can be interrupted by a superseding, or intervening, cause."[136] Put differently, proximate cause can be destroyed by "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another."[137]

Under these standards, Global's tortious interference claim fails, as a matter of law because Paramount did not proximately cause Global's alleged tort-based harms.[138] In its tortious interference claim, Global alleges that Paramount is the lone proximate cause of harms caused by Global's failure to close the APA on October 15, 2012.[139] However, for the reasons stated more fully below, (A) Paramount did not proximately cause Global's harms, if any, and

---

to [Global]; and (6) that [Paramount] had no privilege or justification to excuse its conduct. *See E.g., CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079-80 (W.D. Ky. 1995).

[133] To sustain a claim for tortious interference with a prospective business advantage, Global bears the burden of proving the following similar or related elements: (1) the existence of a valid business relationship or expectancy; (2) that [Paramount] was aware of this relationship or expectancy; (3) that [Paramount] intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages. *See E.g., Monumental Life Ins. Co. v. Nationwide Ret. Solutions, Inc.*, 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003).

[134] *See e.g., Ventas*, 635 F. Supp. 2d at 624.

[135] *In re Davis*, 334 B.R. 874, 886 (Bkrtcy. W.D. Ky. 2005), *reversed in part on other grounds*, 347 B.R. 607 (W.D. Ky. 2006) ("Under Kentucky [tort] law, … plaintiff bears the burden of proving, among other things, that the plaintiff actually suffered damages as a result of the defendant's actions.").

[136] *Ventas*, 635 F. Supp. 2d at 624 (citing *Briscoe v. Amazing Prods., Inc.*, 23 S.W.3d 228, 229 (Kt. Ct. App. 2000)).

[137] *Id.* (quoting *Briscoe*, 23 S.W.3d at 229 (internal quotation marks omitted) and citing Restatement (Second) of Torts § 440 (1965) and *Donegan v. Denney*, 457 S.W.2d 953, 958 (Ky. 1970)).

[138] *See e.g., Ventas*, 635 F. Supp. 2d at 624.

[139] *See* Statement of Undisputed Material Facts, *supra* ¶ 30(b); *see also id.* ¶ 30(a) –(e).

(B) other superseding or intervening causes prevent Paramount from being liable for any such harm, or otherwise destroy proximate causation even if it existed.

Global's claim is articulated in the Amended Complaint as one for tortious interference with a contract.[140] Nevertheless, Global has disclaimed, expressly during oral argument at the May 11, 2015 hearing[141] and implicitly in its briefing,[142] any claim for tortious interference with contract. While Global's pleadings are at odds with Global's disclaimer, this order, construing all well-pleaded facts and inferences in Global's favor, grants summary judgment in favor of Paramount on any claim for tortious interference with a prospective business advantage for lack of causation.

### A. Paramount is Not the Proximate Cause of Global's Alleged Tort Injury, if Any.

As set forth above, in order to prevail on its tortious interference claim, Global must prove that its harms, if any, were the result of Paramount's actions.[143]  Based on the undisputed facts, Global cannot sustain this burden and Paramount is therefore entitled to summary judgment on Global's interference claim as a matter of law. An initial examination of relevant case law is instructive.

In *Ventas*, the United States District Court for the Western District of Kentucky rejected two separately alleged interference injuries, as a matter of law, owing to a lack of causation.[144]

---

[140] *See id.* ¶ 30(a) –(e).

[141] *See* Transcript 5/11/15 65:10–18, docket no. 254, filed May 20, 2015 (MR. OWEN: Again, we don't have a contract claim as it relates to this. The COURT: You don't have a tortious interference with contract claim? MR. OWEN: Right. It's prospective contract. THE COURT: And what is the prospective contract that is to be made? MR. OWEN: It is to close and have the bill of sale to transfer these -- these gyms by the October 15th date."); *see also id.* at 71:2–4 ("THE COURT: Okay. So you're disclaiming entirely an interference with contract claim? MR. OWEN: Yes, Your Honor.").

[142] *See* Global's Opposition at 15–20 (arguing that Paramount wrongly bases its argument on tortious interference with a contract, an analysis inapplicable to tortious interference with a prospective business relationship).

[143] *Ventas*, 635 F. Supp. 2d at 624.

[144] *Id.* at 625–26.

The court first rejected a claim for damages on the order of $155 to $180 million resulting from a delay in issuing shares of common stock allegedly caused by the defendant.[145] In so holding, the court found that the defendant's actions, even if they had caused the alleged delay, were "not necessarily a factor in driving down the value of Ventas's shares" where "Ventas received the full market value for the shares when issued."[146] Put differently, the defendant's "actions [could not] reasonably be considered the substantial factor in determining the market price of Ventas's shares."[147] The court further noted that, while the issuance of shares was always a possibility, Ventas had no evidence of "an actual date for issuing shares" and the "evidence does not suggest that [defendant] knew of any actual plan by Ventas's [sic] to issue [shares] … [or] the timing on that issuance."[148] The court similarly rejected a second claim for tort-based damages stemming from legal fees Ventas allegedly incurred in responding to the defendant's actions because "the chain of causation is too attenuated."[149]

Similarly, in *CMI*, the court rejected CMI's interference claim as a matter of law on the basis of causation. The claim was premised on the actions of the defendant that allegedly prevented CMI from obtaining state contracts for breath alcohol testing equipment.[150] Among other things, the court rejected CMI's claim because "CMI's bid failed to conform to the bid specifications."[151] The court further found that the state was within its prerogative to "lawfully reject" CMI's bid due to such failures, and "it cannot be said that [d]efendants unlawfully caused

---

[145] *Id.* at 625.

[146] *Id.*

[147] *Id.*

[148] *Id.*

[149] *Id.* at 625-26.

[150] *CMI*, 918 F. Supp. at 1081–83.

[151] *Id.* at 1081.

the state to so act."[152] In addition, while the court noted certain negative comments that the

defendant made to state officials about CMI, the court found "no evidence . . . that these

comments caused Missouri to reject CMI's otherwise satisfactory bids." The court stated that

"[s]uch speculation cannot support the conclusion that Missouri's decisions were legally

flawed."[153]

Notably, Global attempts to distinguish *Ventas* and *CMI* as cases involving a "total

absence" of causation evidence.[154] Global's reading of *Ventas* and *CMI* is too narrow. Neither

case involved a total absence of evidence. Instead, they involved circumstances like those at

issue here: the undisputed factual evidence was insufficient to sustain causation for some of the

claims at issue.[155]

> 1. Paramount Provided All of the Member Account Data, Including
>    the Billing Information, on October 11, 2012, and Global's Failure
>    to Close the APA within the Subsequent Four Days Cannot Be
>    Attributed to Paramount.

Independent of the above causal deficiencies, as discussed above,[156] Paramount cannot be

the proximate cause of Global's failure to close by October 15, 2012 because Paramount

transferred the Member Account Data on October 11, 2012.

Perhaps the most significant barrier to causation is history, and as discussed above, it is

undisputed that Paramount transferred the complete set, or "full cut," of Membership Account

---

[152] *Id.*

[153] *Id.* at 1082; *see also* *Snow Pallet*, 367 S.W.3d at 6 ("there is no evidence, other than mere speculation, that [defendant] interfered with" plaintiff's business expectancy—"mere supposition and speculation are insufficient for a case to survive the summary judgment stage.").

[154] *See* Global's Opposition on Causation at 34–35 (emphasis omitted).

[155] *See e.g.*, *Ventas*, 635 F. Supp. 2d at 624–26 (evidence of delay caused by defendants insufficient to show a decrease in market value); *CMI*, 918 F. Supp. at 1081–83 (evidence of negative comments insufficient to show interference).

[156] *See supra*, Part I(A).

Data to Global on October 11, 2012.[157] Nevertheless, notwithstanding Global's (and L.A. Fitness's) possession of the full cut on October 11, 2012, Global was still unable to close four days later on October 15, 2012.[158] Moreover, closing did not occur until 14 days later. This length of this delay is wholly unrelated to Paramount, showing that the delay of the Member Account from Global's demand deadline of October 5 to the actual transfer date of October 11 was not the cause of the failure to close the APA on or before October 15, 2012.

Global's failure to close the APA on or before October 15, 2012 while having all of the Membership Account Data in hand cannot be attributed to Paramount. Likewise, the consequences of Global's failure to close the APA on or before October 15, 2012, consequences specifically negotiated and bargained for in the APA,[159] cannot be attributed to Paramount. Accordingly, regardless of the standing deficiencies, Paramount is also entitled to summary judgment as a matter of law because Global's, and consequently L.A Fitness's, possession of the Member Account Data insulate Paramount from being the proximate cause of the failure to close with the higher purchase price.

2. The Variable APA Purchase and Global's Financial Health Are the Key Elements of the Cause of Global's Harm.

Independent of the other reasons for granting summary judgment, Paramount cannot be the proximate cause of Global's failure to close by October 15, 2012 because the negotiation and execution of the APA controlled the amount of harm suffered by Global, unrelated to Paramount's Actions.

Under the rationales advanced in *Ventas* and *CMI*, Global's alleged harms are, as a matter of law, simply too attenuated from Paramount's actions to sustain a claim for tortious

---

[157] *See* Statement of Undisputed Material Facts, *supra* ¶ 22.

[158] *Id.* ¶¶ 23–28.

[159] *Id.* ¶¶ 4–8, 23–29.

interference. There is no dispute that Global freely and specifically bargained with L.A. Fitness

for an Outside Date of October 31, 2012 for closing the transaction and a flexible Closing Date

under which the formula for calculating the Gross Purchase Price under the APA was dependent,

in part, on whether or not closing occurred by October 15, 2012.[160] Paramount had nothing to do

with the above provisions of the APA. Accordingly, Paramount cannot be the cause of Global's

choice to negotiate a variable Gross Purchase Price formula which ultimately caused the

decreased purchase price under the APA.

Similarly, as in *Ventas*, even if Paramount's actions caused Global to miss the October

15, 2012 variable purchase price deadline (which they did not),[161] Paramount was "not

necessarily a factor in driving down the value" of Global's assets where, pursuant to the terms of

the APA, Global "received the full market value," or the at least freely bargained-for market

value, for its assets.[162] Paramount's actions are independent of, and cannot reasonably be

considered "the substantial factor in determining[,] the market price" of Global's assets.[163]

Indeed, the purchase price was wholly independent of Paramount's actions: the purchase price

could just as easily have increased had Global's financial health improved during the period

considered under the Gross Purchase Price formula. L.A. Fitness specifically negotiated the

variable Gross Purchase Price because it knew that Global's earnings were declining.[164]

Paramount was neither the cause of Global's ailing financial health, nor did it author the

provision of the APA resulting in a reduced purchase price.

---

[160] *Id.* ¶¶ 4–8.

[161] *See supra* Part II(A)(1).

[162] *See Ventas*, 635 F. Supp. 2d at 625.

[163] *See id.*

[164] *See* Statement of Undisputed Material Facts, *supra* ¶ 26.

Accordingly, Paramount is entitled to summary judgment as a matter of law because Paramount cannot be the proximate cause of the reduction in purchase price where that number fluctuated, either up or down, wholly independent of Paramount's actions, and directly resulting from Global's own negotiated pricing structure and financial condition.

      3.  Global's Failure to Comply with Many of Its Obligations under the APA, Wholly Independent of Paramount's Conduct, Ensured that the Sale Would Not Close Before the Reduction in the Purchase Price.

Independent of the above causal deficiencies, Paramount cannot be the proximate cause of Global's failure to close by October 15, 2012 because Global's failure to properly perform its obligations under the ABA is the true proximate cause of the failure to close with the higher purchase price.

As in *CMI*, Global's own failures to conform to the requirements of the APA frustrate causation.[165] As set forth at length above, the APA, a binding contract obligating Global to perform certain obligations, imposed a number of closing conditions upon Global, many of which remained outstanding as of October 15, 2012, and even as late as October 25, 2012.[166] These incomplete closing obligations were wholly independent of any Member Account Data that Paramount contractually managed, particularly since all such Member Account Data had already been transferred to Global on October 11, 2012.[167]

Global's incomplete APA obligations included various lease assignments, SNDAs or recognition agreements, zoning conformance reports, tax clearance certificates, payoff letters, purchase price calculations, and so forth, all of which Global was independently responsible for

---

[165] *See CMI*, 918 F. Supp. at 1081–83.

[166] *See* Statement of Undisputed Material Facts, *supra* ¶¶ 9–14, 16, 18, 23–25, 27–29.

[167] *Id.* ¶ 22.

completing under the APA.[168] Moreover, not only were many such closing conditions unsatisfied as of October 15, 2012, but Global further did not complete such items, or otherwise secure a written waiver of any such obligations as required by the APA, until October 25, 2012.[169]

For example, under the APA, Global was required to terminate the Contracts with Paramount.[170] Although the APA does not clearly specify a deadline, as stated in the ruling granting Paramount's motion for summary judgment on Global's breach of contract claim,[171] Global could not terminate its contract with Paramount prior to October 26, 2012. This would not be fatal to the APA, but it would be fatal to an October 15, 2012 closing date. Similarly, the APA also prohibits Global, and therefore Paramount, from collecting payments from gym members after the closing,[172] so this provision would directly conflict with Paramount's contractual rights and duties under an October 15 closing. The provisions of Global's contracts with L.A. Fitness and Paramount operated to bar a closing date prior to the reduction of the purchase price on October 16, 2012. When Global entered into the APA, it was already impossible to close with the higher purchase price unless either L.A. Fitness or Paramount relinquished some contractual rights.

Global argues that, *if* Paramount had transferred the Member Account Data prior to October 11, 2012, Global *might* have timely completed the remaining open closing deliverables in advance of October 15, 2012, or L.A. Fitness *might* have waived any uncompleted

---

[168] *Id.* ¶¶ 9–14, 16, 18, 23–25, 27–29.

[169] *Id.* ¶ 24, 28; *see also id.* ¶¶ 23, 25.

[170] APA § 7.11(d).

[171] Memorandum Decision and Order Granting In Part and Denying In Part [111] Defendants' Motion for Partial Summary Judgment on Plaintiff's Breach of Contract and Breach of the Implied Covenant Claims, docket no. 274, filed Aug. 31, 2015.

[172] APA § 7.11(e).

deliverables in writing (contrary to the position stated by L.A. Fitness on October 5, 2012),[173]
and the closing *might* have not otherwise been delayed, and the ultimate purchase price *might*
have been higher. This string of possibilities introduces "[a] highly speculative chain of
causation [that] will not suffice."[174] Irrespective of the transfer of Member Account Data, Global
had not completed its other obligations to close on October 15, 2012 under the express terms of
the APA. This undisputed fact defeats causation.

"The obligation of [L.A. Fitness] to consummate the transactions contemplated by [the
APA was] subject to the satisfaction, [at or] before the Closing . . . of all conditions set forth
[therein]."[175] L.A. Fitness had the option to waive, in writing, any of Global's failures to fully
perform,[176] but L.A. Fitness's option to waive does not mean that Global was any less obligated
to perform every obligation fully. The only way Global could ensure that L.A. Fitness would be
required to close would be to fully perform or have written waivers in place, but as of October
15, 2012, many waivers used in the eventual closing were not yet complete. There is no
construction of the APA that renders Global's obligations optional.

L.A. Fitness—the Buyer—was the sole arbiter of whether certain closing conditions
and/or deliverables required from Global would be waived or modified, if ever, in order to
facilitate closing outside of Global's strict compliance with the express terms of the APA. And,
L.A. Fitness was well within its contractual rights to demand strict compliance with the APA

---

[173] *See* Oct. 5, 2012 Wilson Email.

[174] *Hill & Knowlton*, 24 F. Supp. 2d at 762 n.1.

[175] *See* APA § 8, at 90; *see also, e.g., id.* §§ 8.2, at 91–93 ("Each of the covenants and obligations set forth herein
that [Global is] required to comply with or perform at or prior to the Closing shall have been complied with or
performed in all material respects.") and § 8.14 ("At the Closing, [L.A. Fitness] shall have received each of the
documents, certificates, instruments, and agreements … and other items required to be delivered to [L.A. Fitness]
pursuant to Section 4.2(a)…")); Oct. 5, 2012 Wilson Email (outlining "certain open closing deliverables … that are
time intensive and have the potential for delaying closing" but where "are important to [L.A. Fitness] and were
included as a closing condition for that reason").

[176] *See id.* ¶ 8.2.

until at least October 16, 2012, particularly where Global had failed to timely meet so many of its closing obligations. As in *CMI*, where L.A. Fitness was within its prerogative to "lawfully reject" closing prior to October 16, 2012, "it cannot be said that [Paramount] unlawfully caused [L.A. Fitness] to so act."[177] In other words, irrespective of the Member Account Data managed by Paramount, it cannot be said that L.A. Fitness rejected Global's otherwise satisfactory compliance with the APA.[178]

Beyond Global's failure to timely meet its closing deliverable obligations discussed above, it is undisputed that Global was obligated to provide the Member Account Data "[a]t least fourteen (14) days prior to the Closing Date" with the exception of customer names, addresses, telephone and fax numbers, and email addresses.[179] As such, in order to close on October 15, 2012, Global was required to provide L.A. Fitness with the Member Account Data at least as early as October 1, 2012.[180]  But, Global failed to even request the Member Account Data managed by Paramount until October 3, 2012—two days after Global's deadline under the APA to provide such data to L.A. Fitness in order to close by October 15, 2012.[181] Even if Paramount had immediately transferred the relevant Member Account Data on October 3, 2012 when it was first requested (contrary to the Contractual 45-day termination period), Global still would have been outside of the requirements of the APA, and L.A. Fitness would have had contractual authority to delay closing until after October 15, 2012. Again, Global's own failure to satisfactorily comply with the APA is the proximate cause of its alleged harms, not Paramount.

---

[177] *See* *CMI*, 918 F. Supp. at 1081.

[178] *See* *id.* at 1082.

[179] *See* Statement of Undisputed Material Facts, *supra* ¶¶ 11(c), 12–13.

[180] *Id.*

[181] *Id.* ¶ 18.

Furthermore, § 4.1 of the APA states that Closing "shall take place no later than on the fifth (5th) Business Day following the day on which the last to be satisfied or waived of the conditions set forth in Section[] 8 . . . shall be satisfied or waived. . . ."[182] Therefore, in order to ensure closing on Monday, October 15, 2012, Global would have had to have completed (or secured a waiver for) all closing deliverables on or before the previous Monday, October 8, 2012.[183] This in turn would have required all of the Member Account Data to have been transferred to L.A. Fitness two weeks earlier, on September 24, 2012—long before Global even requested such a transfer.[184] Regardless, as of October 8, 2012, it is undisputed that numerous closing deliverables remained incomplete, and therefore, L.A. Fitness could have properly delayed closing until October 16 in order to benefit from the reduction in the Gross Purchase Price.[185] L.A. Fitness stated that several of Global's obligations remained unfulfilled as of October 11, 2012 that prevented closing on October 15, 2012.[186] In short, irrespective of the Member Account Data, Global was not ready to close on October 8, 2012, and therefore, pursuant to the APA, L.A. Fitness was within its rights to delay closing until five business days later.[187]

Global, by its own actions, did not qualify for an October 15, 2012 closing under the express terms of the APA.[188] Global had not properly performed or obtained a waiver of its obligations on October 8, 2012, the last possible day that would have obligated L. A. Fitness to close on October 15, 2012 with the higher purchase price. Accordingly, independent of the other

---

[182] *Id.* ¶ 10.

[183] *Id.*

[184] *Id.* ¶¶ 11(c), 12–13, 18.

[185] *Id.* ¶¶ 9–14, 16, 18, 23–25, 27–29.

[186] *See* Polson Depo. at 132:14–136:9.

[187] Statement of Undisputed Material Facts, *supra* ¶ 10.

[188] *Id.* ¶¶ 9–14, 16, 18, 23–25, 27–29.

reasons for granting summary judgment, Paramount is entitled to summary judgment as a matter

of law because its conduct cannot even be *a* proximate cause of Global's alleged harm, let alone

*the substantial* proximate cause of such harms where Global's execution and performance of the

APA, pre-dated Paramount's alleged interference and ensured that L.A. Fitness could postpone

closing until after October 15, 2012.

**B.  Superseding Causes Cut Off Paramount's Liability, if Any.**

Even if Paramount otherwise proximately caused Global's harm, which it did not, at least

four superseding or intervening causes prevent Paramount from liability for any such harm:[189]

(1) L.A. Fitness had the legal option and the financial incentive to delay closing beyond October

15, 2012; (2) Paramount had a contractual right and obligation to possess the Member Account

Data during the 45-day termination period; (3) Global's steadily declining value predates the

APA; and (4) Global failed to perform timely under the APA.

> 1.  Any Liability of Paramount's is Superseded by L.A. Fitness's
>     Autonomous discretion, contractual authority, and Significant
>     Financial Incentive to Postpone Closing.

First, given Global's ailing financial health, it is undisputed that L.A. Fitness had a

significant financial incentive to delay closing until sometime between October 16, 2012 and

October 31, 2012.[190] Indeed, by closing after October 15, 2012 but before October 31, 2012,

L.A. Fitness was able to acquire Global's assets and close the transaction contemplated by the

APA at a savings of nearly $ 10 million.[191] This business reality, when taken into account

alongside L.A. Fitness's independent and unassailable right to demand strict compliance with the

APA (even pretextually, as described above) until after October 15, 2012 and Global's failure to

---

[189] *See Ventas*, 635 F. Supp. 2d at 624.

[190] *See* Statement of Undisputed Material Facts, *supra* ¶¶ 5–8, 26–29.

[191] *Id.*

satisfactorily complete numerous closing conditions on or before the relevant deadlines,[192] collectively comprises "an act of a third person or other force which by its intervention prevents [Paramount] from being liable for harm to [Global]."[193]

Accordingly, independent of the other reasons for granting summary judgment, and even though Paramount was not the proximate cause of the reduction in the Gross Purchase Price, Paramount would still be entitled to summary judgment as a matter of law because L.A. Fitness's unilateral discretion, contractual authority, and financial incentive to postpone closing until after October 15, 2012, which it did, constitutes a superseding cause that removes liability from Paramount.

2. Paramount's Contractual Right to Maintain the Member Account Data During the 45-Day Termination Period Defeats Proximate Cause.

Second, it is undisputed that the Contracts between Global and FRAI imposed a 45-day termination period following written notice of termination and Global terminated the Contracts on September 11, 2012.[194] Therefore, as stated in the ruling granting Paramount's motion for summary judgment on Global's breach of contract claim,[195] Paramount was contractually obligated and permitted to continue processing and managing the Member Account Data at issue, including the Billing Information, until at least October 26, 2012—after the APA was ultimately closed, and long after October 15, 2012. Paramount was not required to terminate its maintenance of the Member Account Data prior to the end of the 45-day termination period.

---

[192] *Id.*; *see also id.* ¶¶ 9–14, 16, 18, 23–25.

[193] *See, e.g., Ventas*, 635 F. Supp. 2d at 624.

[194] *See* Statement of Undisputed Material Facts, *supra* ¶¶ 1–3.

[195] Memorandum Decision and Order Granting In Part and [111] Denying In Part Defendants' Motion for Partial Summary Judgment on Plaintiff's Breach of Contract and Breach of the Implied Covenant Claims, docket no. 274, filed Aug. 31, 2015.

Even if a Paramount's actions were otherwise tortious, which they are not, Paramount would still "not be liable, if [it] acted in good faith in asserting a legally protected interest."[196] Section 773 of the Restatement (Second) of Torts explains:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract … does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed….[197]

This general limitation on causation is well established under Kentucky law.[198] Paramount's contractual right to continue to hold and process the Member Account Data for 45 days supersedes any liability for Global's alleged tort harms, if any.

Crucially, when Global executed the APA on September 5, 2012, Global knew that it was obligated to provide a 45-day notice of termination to Paramount.[199] Global also knew that even if it issued a termination notice September 5, 2012, the 45-day termination period in the Paramount Contracts would not expire until October 20.[200] Thus, when Global agreed in the APA to potentially close the transaction by October 15, it created expectations inconsistent with its obligations to Paramount. When Global issued its termination notice on September 11, 2012, Global could not close the APA prior to October 26, 2012 without breaching the Paramount Contracts, absent some written modification of the Contracts by Paramount or some waiver of the APA by L.A. Fitness. When Global executed the APA, containing provisions that contradicted the Contracts with Paramount, closing could not take place by October 15, 2012,

---

[196] *See CMI*, 918 F. Supp. at 1080 (emphases in original omitted).

[197] *Id.* at n.4 (quoting Section 773 of the Restatement (Second) of Torts).

[198] *Cf., e.g., Gulf Coast Farms, LLC v. Fifth Third Bank*, Nos. 2011-CA-000965-MR, 2011-CA-001575-MR, 2012-CA-000491-MR, 2013 WL 1688458 at *6 (Ky. Ct. App. April 19, 2013) ("It has been held that a claim for tortious interference cannot be sustained where a defendant is sued for exercising a right found in the parties' contract.").

[199] *See* Statement of Undisputed Material Facts, *supra* ¶¶ 1–4.

[200] *Id.*

and therefore, as of the execution of the APA, the higher APA purchase price was impossible to obtain without Paramount or L.A. Fitness waiving some of their contractual rights.

Accordingly, independent of the other reasons for granting summary judgment, Paramount would still be entitled to summary judgment as a matter of law because the provisions of the Contracts with Paramount and the APA operate as superseding causes of the reduced purchase price, even from the very execution of the APA.

> 3. Global's Steadily Declining Value, Which Predates the APA, is an Intervening Cause of the Reduced Purchase Price.

Third, it is undisputed that Global's value was steadily declining even before the APA was signed.[201] Specifically, L.A. Fitness testified that, "[a]s we progressed through the negotiations [leading up to the APA] and we were getting financial statements from [Global,] . . . we saw what was happening to the earnings, the EBITDA, we saw how that was declining."[202] Consequently, even before the APA was signed, L.A. Fitness specifically negotiated a variable formula for determining the Gross Purchase Price to insulate L.A. Fitness from Global's declining value.[203] Global's depressed value caused Global's harm, i.e., a reduced purchase price. Six days' delay in providing the Member Account Data did not reduce the Gross Purchase Price. That data was only one of many past-due deliverables needed for closing the APA. Had Global's financial situation improved, the Gross Purchase Price would have been higher, showing that the formula, and certainly Global's overall financial health, constitute intervening causes that were the controlling factors in whether Global was harmed or received a windfall under the variable purchase price formula.

---

[201] *Id.* ¶¶ 7, 26.

[202] *Id.*

[203] *Id.*

Accordingly, independent of the other reasons for granting summary judgment, and even though Paramount was not the proximate cause of the reduction in the Gross Purchase Price, Paramount would still be entitled to summary judgment as a matter of law because even if Paramount caused a delay in closing the APA, which it did not, Global's declining value, an economic reality wholly independent from Paramount's conduct, comprises a "force which by its intervention prevents [Paramount] from being liable for harm to [Global]."[204]

> 4.   Global's Own Conduct, in Addition to Precluding Proximate Cause from the Outset, Would Also Be a Superseding Cause.

Finally, it is undisputed that Global specifically bargained for a flexible Closing Date limited only by the Outside Date of October 31, 2012 and a variable formula for determining the Gross Purchase Price, which was dependent on Global's steadily declining value.[205] It is also undisputed that Global failed to request the Member Account Data being managed by Paramount in order to provide the same to L.A. Fitness 14 days prior to October 15, 2012, as required under the APA, and otherwise had not satisfied all of the closing conditions set forth in the APA as of October 15, 2012.[206] It is also undisputed that for these deficiencies and failures of Global, as of October 15, 2012, L.A. Fitness was not obligated to close the APA transaction.[207] To the extent that such undisputed facts do not prevent proximate cause altogether for the reasons discussed above, and more fully in Part II(A)(3), they are at a minimum intervening causes that prevent Paramount from being liable for Global's tort-based harms, if any.[208]

---

[204] *See, e.g., Ventas*, 635 F. Supp. 2d at 624.

[205] *See* Statement of Undisputed Material Facts, *supra* ¶¶ 4–8, 26.

[206] *Id.* ¶¶ 9–14, 16, 18, 23–25, 27–29.

[207] *Id.*

[208] *Ventas*, 635 F. Supp. 2d at 624.

Accordingly, independent of the other reasons for granting summary judgment, Paramount would still be entitled to summary judgment as a matter of law because Global's actions and failures to perform under the APA constitute superseding causes.

### III.   Global's Claim for Punitive Damages Premised on Tortious Interference Is Also Dismissed.

In addition to seeking compensatory damages, Global further seeks to "recover punitive damages" in connection with its tort claim.[209] Where Paramount is entitled to summary judgment as a matter of law on Global's underlying tort claim for want of causation, Paramount is likewise entitled to summary judgment as a matter of law on Global's request for related punitive damages.

## <u>ORDER</u>

IT IS HEREBY ORDERED that Defendants' Motion for Partial Summary Judgment RE: Global's Tortious Interference Claim for Lack of Causation[210] is GRANTED. Global's claims for tortious interference and punitive damages based on tortious interference are hereby DISMISSED with prejudice.

Dated August 31, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[209] Amended Complaint ¶¶ 45, 80, at Count VII.

[210] Docket no. 121, filed under seal Aug. 4, 2014; redacted version, docket no. 127, filed Aug. 7, 2014.